**RESERVE PLAN, INC.**

v.

**ARTHUR MURRAY, INC., Tuition Plan, Inc., and Educational Credit Bureau, Inc.**

**No. 12701-1.**

United States District Court
W. D. Missouri, W. D.
July 21, 1965.

---

7. Ibid.

8. See supra, note 3, p. 10.

9. See supra, note 2, p. 4.

10. Christy Affidavit, filed June 5, 1964, p. 8.

11. United States v. Lustman, 258 F.2d 475, 477 (2d Cir. 1958).

Ralph M. Jones, Swanson, Midgley, Jones, Blackmar & Eager, Kansas City, Mo., for plaintiff.

Elton L. Marshall, Allan L. Bioff, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Arthur Murray, Inc.

William H. Curtis, Morrison, Hecker, Cozad & Morrison, Kansas City, Mo., for Tuition Plan, Inc. and Educational Credit Bureau, Inc.

JOHN W. OLIVER, District Judge.

With great reluctance, we have concluded that justice requires that we not make final disposition of this jury waived anti-trust case at this time.

We are convinced that a just final determination can best and only be secured (a) by a determination at this time of the question of liability; (b) by the entry of an order reopening the case for the reception of additional evidence on the issue of damages; and (c) by the entry of an order of reference to a master, pursuant to Rule 53 of the Rules of Civil Procedure.

We struggled longer with the final briefs and the transcript of the trial proceedings in this case than any other case since we have been on the Bench. We were finally forced to the conclusion that the damage issue could not, with fairness to any of the parties, be decided on the present record.

We recognize at the outset that our controlling court "disapproves unnecessary references" (Johnson Fare Box Company v. National Ejectors, Inc., 8 Cir. 1959, 269 F.2d 348 at 351), but we

believe, for reasons to be stated, that a reference in this case is necessary.

Most of the disapproval voiced against the utilization of Rule 53 has occurred in cases in which particular district judges have referred *all* issues of a particular case to a master, as distinguished from a reference of "matters of account," which are treated separately by paragraph (b) of that Rule. Indeed, there is real doubt whether Rule 53(b) contemplates "a showing that some special condition requires" a reference of "matters of account."

We need not reach that question here because we believe that a review of our efforts to get plaintiff's theory of damages clearly stated and to receive comprehensible evidence in connection with its proof of damages establishes that an exceptional condition exists in this case in connection with what we find and determine to be a complicated issue within the meaning of Rule 53.

▇▇▇ We think it unnecessary to elaborate that we are convinced that defendants have violated the anti-trust laws of the United States and that plaintiff has been damaged. Justice requires that courts recognize that all procedural rules and devices are designed to adjudicate the rights of the parties. Any convenience that may result to judges or lawyers from proper utilization of modern procedures is but incidental to the administration of justice.

▇▇▇ It therefore follows that the substantial detriments that may flow from any procedural breakdown that may occur in a particular case while it is being tried should not be visited upon the parties if that result may be justly avoided. All of this, of course, must be balanced against giving a particular plaintiff innumerable bites at the cherry because, as was suggested in Stoll v. Gottlieb, 305 U.S. 165, at 172, 59 S.Ct. 134, at 138, 83 L.Ed. 104 (1938), "[i]t is just as important that there should be a place to end as that there should be a place to begin litigation."

We are convinced that a miscarriage of justice would result if the damage issue remaining in this case is not reopened in order that additional evidence be received by a master appointed and regulated by an order of reference made pursuant to Rule 53 of the Rules of Civil Procedure.

We have no doubt but that a substantial verdict rendered by us on the present record might be sustained by our appellate court. But neither have we any doubt that the evidence upon which such a verdict would be based is not the sort of evidence upon which verdicts should be based. We see no reason to base verdicts upon inadequate accounting data when more adequate accounting data can be made available.

In order therefore to reduce the matters to be referred to "matters of account," within the meaning of Rule 53 (b), and to place this case in a posture where proper accounting data may be made available for systematic study and evaluation, we shall make findings of fact and state our conclusions of law on the issue of liability which was earlier separated from the issue of damages pursuant to Rule 42(b) (Tr. 9).

### FINDINGS OF FACT

The procedure followed in connection with the findings of fact simplified our task in regard to the liability issue. Pursuant to our direction, counsel for all parties submitted suggested findings of fact in writing and supported their suggestions with specific citation to particular pages of the record. All parties availed themselves of the opportunity afforded to attack the suggested findings of opposing counsel by like citations to the record.

A study of the particular suggestions and the cited portions of the record demonstrate that the parties are not in substantial disagreement about whether particular events took place; the parties' disagreements center upon the ultimate inferences that must be drawn from those events.

We have carefully reviewed plaintiff's suggested findings of fact and the record cited in support. Except for modifications that will be apparent, our findings, generally speaking, accept and adopt many of plaintiff's suggested findings in language suggested by plaintiff. At the close of our findings, we shall indicate the suggested findings of the plaintiff and of the defendants that we reject.

Specifically, we find:

1. The predecessor of plaintiff corporation was a partnership named Midwest Finance Company which first started handling student notes for the Kansas City Arthur Murray studio in the mid-1940's (R. 17). W. E. Gregory was manager of Midwest Finance Company at that time, but thereafter left to become business manager of the Kansas City Arthur Murray studio (R. 18).

2. The president of plaintiff, C. C. Hart, decided to expand his Arthur Murray studio business (R. 21) and to incorporate to handle it, and at the suggestion of the licensee of the Kansas City studio chose a name not containing "finance" or "loan" (R. 20). The incorporation date was June 1, 1946 (PX 53–1, p. 1).

3. Charles E. Redhair was employed by Midwest Finance Company in September of 1946 (Tr. 666), and later by plaintiff (667–8).

4. At the end of 1946, plaintiff had nine Arthur Murray studios as customers and an outstanding note balance of $177,055.37 (P.Ex. 53–1). From the outset it did not take up the discount on notes as income until they had been collected in full (Note to Ex B to PX 53).

5. On May 31, 1947, plaintiff had 13 Arthur Murray studios as customers and an outstanding Arthur Murray student note balance of $380,245.25 (PX 53–2).

6. Teichman organized Educational Credit Bureau of New York to handle Arthur Murray studio notes on a collection basis (R. 434) and hired W. E. Gregory to come to New York to manage it (Teichman deposition, p. 15; R. 365).

7. On May 31, 1948, plaintiff had an outstanding Arthur Murray student note balance of $608,231.33 and 32 studios as customers (PX 53–3).

8. The Arthur Murray, Inc.-Educational Credit Bureau of Kansas City loan agreement covering the $100,000 (PX 2) entered September 15, 1948, calls for 4% interest, provides (par. 3) that Educational Credit Bureau of Kansas City will comply with all provisions of the laws of Missouri and of the United States which failure to observe would constitute any ground for cancellation of its charter or subject it to any penalty, places (par. 7) restrictions on purchase of contracts from and loans to studios, and provides (page 9) that Arthur Murray, Inc. will use its best efforts and assist Educational Credit Bureau of New York to obtain as customers the various Arthur Murray studios in operation or to be operated in the future.

9. On December 1, 1948, an additional $100,000 loan was covered by a supplemental agreement (PX 2–a) under the same provisions of PX 2, but modified to require two-thirds of the annual net income to be paid on interest and principal, and containing a further restriction as to notes purchased.

10. In December, 1955, W. E. Gregory introduced Charles E. Redhair to David A. Teichman in Kansas City, they discussed the formation of a third Arthur Murray studio note finance company, and the possibility of Redhair managing it. He was interested and took Teichman to the plaintiff's offices in the absence of Mr. Hart (R. 398–400).

11. In February, 1956, Teichman called Gregory to find out if Redhair was still interested and on receiving

his reply that he was (R. 508), called John A. Morrison to make the arrangements with Redhair and to handle the incorporation of the new company (PX 36, Answer to Question 2).

12. The first part of March, 1956, Charles E. Redhair gave notice to C. C. Hart that he was leaving plaintiff the end of March to go with a new company financing Arthur Murray studios, but that he was not going to take studios doing business with Reserve Plan (R. 32–33).

13. Morrison sent Teichman a draft of the articles on March 5, 1956 and suggested W. E. Gregory and Charles E. Redhair and himself as directors with two nominal directors from his office that could be replaced by whomever Teichman might ultimately want to be on the board (PX–4).

14. On March 7, 1956, Teichman sent a letter to the licensees announcing the proposed formation of Tuition Plan, Inc., and asking for subscriptions to its stock (PX 5).

15. On March 6, 1956, Charles E. Redhair ordered 50,000 coupon books for Tuition Plan, Inc. (PX 9, par. 3).

16. Charles E. Redhair employed two girls for Tuition Plan, Inc., who went to work at Educational Credit Bureau for training on March 19, 1956 (Rec. 714, PX 9, par. 4). He spent time in the Educational Credit Bureau office in March writing letters and making calls from there (R. 714).

17. On March 22, he ordered 12,500 coupon books to be imprinted with the name or code of 23 studios (PX 9).

18. On March 28, Arthur Murray, Inc., sent out a letter to franchisees (PX 11) advising of the formation of Tuition Plan, Inc. and after April 30 it would approve only Educational Credit Bureau of New York, Educational Credit Bureau of Kansas City and Tuition Plan, Inc. and would not permit licensees to engage in finance company operations.

19. On March 31, Charles E. Redhair ordered 10,000 more coupon books for an additional 20 studios (PX 9, 2nd page).

20. On April 3, 1956, he wrote, using in part Educational Credit Bureau stationery, to studios he had done business with for plaintiff, reminded them that Tuition Plan, Inc. had been approved by Arthur Murray, Inc. in the release of March 28th, and stated he would be able to start handling their business by May 1, 1956 (PX 13).

21. On April 14, and on April 17, he wrote other studios to the same effect still using Educational Credit Bureau letterheads (PXs 13–B through I).

22. On April 17 using in part Educational Credit Bureau stationery, he wrote to a licensee doing business with plaintiff in reply to her letter of inquiry to Teichman about Tuition Plan, Inc., saying that during the time it was indebted to Arthur Murray, Inc., Arthur Murray or Teichman will reserve the right to approve accounting and attorneys' fees and executives' salaries (PX 18).

23. On April 13, Teichman wrote C. C. Hart in answer to his letters stating that "It was certainly not our intention in our release of *April* (March) 28th to imply that your company is not operating properly or that it has not co-operated with us in the past," and "We, of course, do not want you to suffer any loss on the loans which you have made to Arthur Murray licensees. We shall be glad to be instrumental in having Tuition Plan, Inc. and Educational Credit Bureau, Inc., cooperate with you so that you should not sustain any losses on your loans. If necessary, we will not require any studio to change over to Tuition Plan, Inc. or Educational Credit Bureau, Inc. where such a change

would obviously cause you to sustain a substantial loss." (PX 19).

24. On May 3, 1956, Morrison wrote Paul M. Coonrod, House Counsel and Assistant Secretary of Arthur Murray, Inc. that "I am a little concerned as to the effect of Mr. Teichman's bulletin that all studios do business with one of the three finance companies. If you would send me a copy of the current franchise agreement now being used, I would like to check some law on the subject and pass on to you and Mr. Teichman my thoughts with regard to possible violation of any anti-trust laws." (PX 34).

25. Defendants' answers to plaintiff's interrogatory as to what service Morrison performed include correspondence with other persons but do not mention Mr. Teichman or Mr. Coonrod.

26. The Arthur Murray, Inc.-Tuition Plan, Inc. loan agreement dated May 29, 1956 (PX 17) omits the provision contained in the Arthur Murray, Inc.-Educational Credit Bureau agreement that Arthur Murray, Inc. will use its best efforts to obtain Arthur Murray studios as customers. It was signed by John A. Morrison as secretary of Tuition Plan, Inc. and Paul Coonrod as assistant secretary of Arthur Murray, Inc.

It provides similar restrictions on contracts which Tuition Plan, Inc. can purchase and loans it can make, provides Arthur Murray, Inc. must approve the compensation to be paid to officers, employees, attorneys and auditors, has the same provision as to obeying the law, and covers an initial loan of $105,000 and such additional sums as Arthur Murray, Inc. may deem necessary. The indebtedness had increased to $430,000 at November 21, 1958 (PX 3, par. 5).

27. Plaintiff had written contracts with many of its Arthur Murray studio customers providing that they would send all their student notes to plaintiff, some of which were terminable by the licensee on 30 or 90 days' notice (PX 15). All of them left plaintiff in April but two (R. 123).

28. Five former licensee customers of plaintiff testified at the trial, some of whom testified expressly that they would not have changed to Educational Credit Bureau or Tuition, Plan, Inc., except for the release of March 28, 1956. The testimony of all licensees and all the facts and circumstances of this case support the inference that all the licensees took their business away from plaintiff as a result of the concerted actions of the defendants.

29. Four other licensees and the studio manager of another licensee testified by deposition in a manner generally consistent with the testimony of plaintiff's licensee customers who testified at the trial. That deposition testimony was also consistent with the ultimate factual inferences we have drawn from all the facts and circumstances in evidence.

30. A West Coast licensee with a number of studios, and who also had a finance company that was handling their paper, told his sublicensees and managers not to pay any attention to the March 28, 1956 letter, that he felt it was illegal, and they did not switch their paper at that time (R. 241). Three of them received Teichman's letter of July 13, 1956 notifying them that the franchises would terminate August 31, 1956 (PX 40, 41, 42), but after his finance company sold all its Arthur Murray paper to Tuition Plan, Inc. (R. 245), and his studios began doing business with Tuition Plan, Inc. (R. 254), he continued to operate them.

31. In April, 1956, Gregory of Educational Credit Bureau wrote house counsel for Arthur Murray, Inc. that a studio that had been doing business with them had been sold to a customer of plaintiff and was switching its paper to it. He said that sort of thing could be guarded against if Arthur

Murray, Inc. would notify both Educational Credit Bureau and Tuition Plan, Inc. when a new franchise is issued, both of new territory and transfer of old (PX 31).

32. Copies of inter-office correspondence from the business records of the Bank of America recite that Mr. McCormick (identified in his own deposition as a former licensee, regional director and later a vice president of Arthur Murray, Inc.) had called at its office, showed the Arthur Murray, Inc. letter of March 28, 1956 and stated that he regretted that he had to make this change, but apparently he has no choice in the matter, and a reply thereto that it appeared from the letter that it will only be a matter of a very short time until all of the paper generated by these franchise operators will be handled under their new program (PX 21, 21a, 21b).

33. Another ex-licensee and one-time regional director of Arthur Murray, Inc., although a stockholder in Educational Credit Bureau, had refused to do business with it although solicited many times by Gregory, but switched to Tuition Plan, Inc., after receiving a release that he should, because he didn't feel he had any choice (R. 232–5).

34. Redhair wrote Arthur Murray, Inc. house counsel on June 4, 1956 that "We have completed our first month of operation and feel we are off to a good start. We ended the month with an outstanding contract balance of $355,282. During the month we purchased BP's from 73 studios. As of the close of business May 31, the paid in stock was $147,000, counting the $55,000 which you sent in." (PX 37).

35. On January 17, 1957, Redhair wrote Arthur Murray: "It was a pleasure to see you when Mr. Gregory and I were in New York in December. We want to thank you for taking the time to talk with us. We discussed stockholders in Tuition Plan and I

thought you might like to have a list of those that have purchased stock." (List of stockholders). In addition to the $130,000.00 sold, Mr. Teichman has reserved $30,000.00 which will be purchased upon completion of his trust agreement. This makes a total of $160,000.00, and it has been suggested that our paid in capital be limited to $200,000.00. This leaves us an additional $40,000.00 available. I am enclosing our Balance Sheet and Statement of Income as of December 31, 1956. This includes our first eight months of operation and leaves us with a net income after taxes $3,487.83. We certainly appreciate and want to thank you for all of the assistance you have given us in organizing the starting of this new company and hope you are satisfied with our operation to date."

36. Under date of December 3, 1958, Arthur Murray, Inc. sent to all of its licensees an untitled release concerning the release of March 28, 1956 (PX 46), reciting that a copy of the consent decree (PX 46a) was enclosed. PX 46 set forth the reasons why it wanted them to use Educational Credit Bureau of Kansas City, Educational Credit Bureau of New York or Tuition Plan, but that to avoid litigation with the government, it had, in effect, consented to waive that requirement, except under certain conditions.

37. Teichman, Robert Norman (Kathryn Murray's brother), and Kathryn Murray were members of the Board of Directors of Educational Credit Bureau of Kansas City throughout 1956 (DX 102). Robert Norman was its vice president (PX 3, par. 4). Arthur Murray, Teichman and his wife, Robert Norman and Rebecca Roman, the Arthur Murrays' daughter, together owned 40+% of its stock. Gregory owned 10+% (PX 3, par. a).

38. Teichman and his wife owned 55% of the stock of Educational Credit Bureau of New York, Mrs. Murray's

brother had an additional 20%, and Teichman managed the company (R. 448).

39. Two brothers of Arthur Murray and the wife of one owned 22+% of the stock of Tuition Plan, Inc. Gregory and Redhair owned 7+% each (PX 3, par. c).

40. Teichman testified that he realized that "as a result of this release and the licensees having to do business with only these three companies, that those three companies would get all the financing business of all the Arthur Murray studios except the permanent franchisees" and that he "expected eventually that would be the result" (R. 455, 456). The record is replete with other testimony and other evidence that is consistent with that plan, its execution, and its ultimate result.

41. We expressly reject defendants' explanation of their concerted actions as having been based on the exercise of normal business judgments or upon any real discontent with plaintiff's method of doing business.

We reject plaintiff's suggested findings 6, 9, 34, 41 through 45, and 55, because, although generally supported by the record, such findings are irrelevant. Finding 32 is rejected because it is based on inadmissible evidence.

We also reject for the time being, and in order to clear the record, plaintiff's suggested findings 46 through 51, and 58 through 65 because they relate to the damage issue.

While many of the findings suggested by each of the defendants are supported by the record (in fact many of defendants' suggested findings are not disputed) we believe both defendants' appellate position would be best protected by our refusal of all defendants' suggested findings in order that our rejection of defendants' factual theory of defense be unmistakable. Accordingly, we reject all suggested findings of fact made by both defendants.

## CONCLUSIONS OF LAW

■ 1. Defendant Arthur Murray, Inc.'s letter to licensees of March 28, 1956 requiring that they do business with one of the three named finance companies was in violation of Section 1 of the Sherman Act by compelling contracts in restraint of commerce among the several states.

■ 2. Defendants Educational Credit Bureau and Tuition Plan, Inc., whether knowing that such a letter was to be sent or not, accepted the benefits thereof and joined and actively participated in carrying out the combination in restraint of commerce in violation of Section 1 of the Sherman Act.

■ 3. Defendants combined with each other to monopolize part of the commerce among the several states in violation of Section 2 of the Sherman Act.

■ 4. Plaintiff was injured in its business and property by reason of the illegal acts of defendants in violation of the anti-trust laws, and is entitled to recover threefold the damages by it sustained, and the cost of suit, including a reasonable attorney's fee.

We reject all suggested conclusions of law of both defendants in order that their appellate position be clear.

Conclusion of law No. 4, above stated, which includes the statement that "plaintiff was injured" shall also be considered a finding of fact for purposes of determining the liability issue. We, of course, have made no finding nor have we stated anything other than the statutory conclusion of law in regard to the amount, as distinguished from the fact, of plaintiff's damage.

## RATIONALE UNDERLYING ORDER OF REFERENCE

The determination of the separated liability issue required no more than the exercise of the traditional judicial function of a court sitting in a jury-waived

case. In our judgment, the issue of liability did not present a particularly close question. We are inclined to believe that the experienced and competent counsel for all parties would have then been surprised by any determination of that issue other than a finding for the plaintiff.

Neither the late Judge R. Jasper Smith nor did we know in the early stages of this case whether it would be tried with or without a jury. But both judges knew that regardless of how this case would be tried, it could not be fairly tried unless the plaintiff, well in advance of trial, settled upon a consistent theory of damages and unless that theory and plaintiff's contemplated proof was fully outlined in detail so that defendants could, also well in advance of trial, be in a posiiton to prepare to defend against plaintiff's specific claims.

Both judges were not only cognizant of this necessity of fundamental fairness to the defendants; they were also cognizant of the many cases in which excessive plaintiff's verdicts, based upon overly enthusiastic accounting testimony, had been set aside on appeal. And, more important, both judges were under duty to see that whatever verdict might be rendered, if a verdict was to be rendered, would be based upon the best available evidence that would be tested in accordance with all the protective devices of our traditional adversary system of jurisprudence.

On March 30, 1961, the late Judge Smith, after making a specific reference to the Prettyman Report relating to "Procedure in Anti-Trust and Other Protracted Cases" (13 F.R.D. 62) ordered plaintiff to file "a written statement of the legal and factual issues involved in respect to plaintiff's claim."

The last paragraph of Judge Smith's order of March 30, 1961 stated:

It is vital to successful use of pre-trial procedure in this case that the Court and the parties know definitely what the issues are to be tried, those that are contested, and the mode and nature of proof that each side will pursue to adduce evidence in support of their respective theories of action and defense. Counsel may be fully cognizant of such matters at this time, but the Court is not. The Court must be put on an equal footing with counsel.

In response to that order, plaintiff on April 28, 1961 filed only a short list of items not admitted by defendants' answers. Plaintiff added the following to what it denominated as its "Statement of Issues" :

### STATEMENT OF MODE AND NATURE OF PROOF

The last paragraph of the Court's order of March 30, 1961 indicates that the Court desires to be advised at this time of the mode and nature of proof to be pursued.

This, however, will depend in large measure on the extent of the co-operation of defendants in making admissions and producing records, but plaintiff anticipates that it may be required to file interrogatories, requests for admissions, motions for production and inspection, and take depositions of officers and employees of defendants and of franchisees.

None of the parties thereafter took any particular action in regard to this case for over a year. Judge Smith died in the meantime. As soon as we could reach this case after Judge Smith's death, we held an informal conference with counsel.

Our direction for the commencement of discovery is reflected in our preliminary pre-trial order of February 25, 1963. We noted at that time that "until depositions be taken in Kansas City and in New York, efforts to simplify and segregate the issues would be unnecessarily difficult."

On September 13, 1963, after noting that a number of depositions had been taken, we ordered that a preliminary pre-

trial conference be held on September 25, 1963 "in order to prepare for final pretrial conference and for the ultimate trial of the action."

At that conference the admissibility of four accounting charts that purported to reflect plaintiff's trial theory of damages were fully discussed and considered. Those four charts made their first appearance in this case as exhibits introduced during the deposition of Creighton C. Hart, plaintiff's president, filed August 5, 1963.

In our order of September 26, 1963, made after the full discussion of the four charts at the conference, we directed plaintiff to "outline its theory of damages and state fully the authorities upon which it relies to support such theory." Plaintiff was also specifically directed in that order to "indicate the general thrust of the evidence it intends to adduce and state the nature of the oral or documentary proof it contemplates introducing."

On November 13, 1963, in response to that order plaintiff stated the following in regard to its trial theory and intended proof of damages:

### CHARTS PROFFERED

The question of the admissibility of the charts as such is somewhat altered by the fact the parties have agreed to waive a jury.

Whereas, it would have been considered essential that they actually be admitted for the jury's inspection in order for them to absorb and put in focus the underlying evidence, this will not be necessary for the Court, but we nevertheless feel they would be a substantial aid to him in determining the proper amount of damages. *It should not be the burden of the Court to compile tables from an accountant's testimony to enable him to do that.* (Emphasis ours)

The only authority called to which our attention was directed was A. C. Becken Co. v. Gemex Corp., 7 Cir. 1959, 272 F.2d 1, also reported 199 F.Supp. 544, and 314 F.2d 839. (In a reply brief, after noting defendants' complaint that "plaintiff wholly failed to outline its theory of damages and state fully the authorities upon which it relies to support such theory," plaintiff added Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) ). After a discussion of the Gemex case, plaintiff stated:

Pursuant to this [case, i. e. Gemex] we believe that plaintiff's projection here is still admissible as proper prima facie evidence of its damages, that it is up to the defendants to demonstrate by their own evidence that it is not accurate, and that plaintiff is entitled to rebuttal evidence. * * * However, plaintiff is having prepared a further chart based on the terms of the stock purchase agreement between Educational Credit Bureau and the stockholders of Educational Credit Bureau of New York in March, 1959 as a possible further aid to the Court in determining the value of the business taken from plaintiff. It will be furnished shortly.

Plaintiff added generally that "our theory is simply that the plaintiff is entitled to be compensated for the loss caused it by defendants' illegal conduct, not only of future profits reasonably to be expected and reasonably estimated, but also of capital investments." By what sort of evidence those losses were to be established was not suggested specifically.

In purported compliance with our direction to indicate the thrust and nature of its oral and documentary proof, plaintiff stated in most general language that "the nature of the testimony will be the background evidence of the history of plaintiff's business * * * and, of course, evidence as to the losses sustained by plaintiff." Plaintiff added with typical inexactitude that "the documen-

tary proof will consist of contracts, correspondence, and material furnished by defendants pursuant to discovery."

In further pre-trial conferences held immediately before trial, we directed, pursuant to Rule 42(b) of the Rules of Civil Procedure, that the evidence relating to liability be received first and the evidence relating to damages be then received (Tr. 9).

On the day the trial commenced, however, it became apparent that counsel for the plaintiff over the weekend before the trial was to begin had abandoned its effort to prove its alleged damages under the theory reflected by the four charts that had been the subject of detailed pre-trial discussion (Tr. 1–17; 93).

That abandonment produced, as we stated at the outset of the trial, "an entire vacuum as to the specific theory upon which the plaintiff seeks to proceed as far as its claim for damages was concerned" (Tr. 6). We felt, however, that the age of the case dictated that the trial of the case not be further delayed (we had already given the parties a final twenty-four hours to exhaust settlement negotiations (Tr. 9)).

We were also of the opinion that if plaintiff acted promptly, the defendants would be fully advised of plaintiff's damage theory before we would reach the trial of the separated damage issue.

Plaintiff on that first day of trial was therefore directed "to advise the Court and the defendants exactly the theory upon which plaintiff intends to proceed in proving any assumed damages in this case" (Tr. 8). Counsel for plaintiff was then unable to outline the data upon which he intended to base his theory of damages, stating only that "our evidence necessarily will be based on our books and records *and the information furnished us by the defendants as to their experience with these schools* (emphasis ours) (Tr. 9–10).

Plaintiff's counsel added that he wanted "the opportunity of conferring with the auditor before giving a full answer as to the exact manner in which [its evidence] will be presented" (Tr. 10).

Plaintiff also then conceded that it had not yet "spelled out those portions of the books and records that will establish [its] theory of how [it] would prove damages" (Tr. 10). Plaintiff did not then know whether its evidence would be presented in the form of an exhibit (Tr. 11).

Plaintiff's counsel then stated that "I am sure [that] in the morning I can advise you more exactly of the theory and will make every effort to get the outline just as soon as time permits" (Tr. 11). The record is clear, however, that plaintiff's four pre-trial charts had not been approved by plaintiff's expert witness (Tr. 966) with the result that plaintiff had to begin from scratch so far as its trial theory of damages was concerned. Plaintiff's accounting evidence on damages, as a practical matter, was assembled in final form during the trial itself.

Plaintiff's counsel was required to talk with his expert witness during noon recesses "to get him started again" (Tr. 77). He had to work with him at night in order to get the "specific data about these figures and where it will be found" (Tr. 120).

On the second day of trial, plaintiff's counsel was able to present a partial outline of its theory, although he conceded that "it was hastily prepared last night" (Tr. 189). Plaintiff's counsel also stated that "the auditors are working today on an exhibit which will show [our general theory] in detail" (Tr. 189), but he could not report "how long it is going to take" (Tr. 194).

Being convinced then, as we are now, that plaintiff's counsel was moving as rapidly as he could move under the circumstances as they then existed, we proceeded with the trial of the liability issue, suggesting to all counsel that "further discussion of the damage aspect [could] do nothing except delay the trial

moving forward on the question of liability" (Tr. 195).

When we reached the damage issue during the second week of the trial, it became apparent on cross-examination of plaintiff's expert witness that, although he had been consulting with the plaintiff's president since 1959 in regard to this lawsuit, the new exhibits that purported to summarize his expert testimony were not prepared until after the trial had commenced. In fact, those exhibits were not completed until the night before he took the witness stand (Tr. 952–953).

During the direct examination of plaintiff's expert witness counsel for one of the defendants accurately stated the nature of the problem created by plaintiff's preparation and presentation of its evidence on damages. He stated that "this whole thing has been piecemeal from the very beginning. We get a piece of something on damages, then we get another one, and then this morning we have this additional work sheet that seems to be worked out. Every few hours we get something further * * *" (Tr. 911).

When we ruled that plaintiff had adduced sufficient evidence to take the entire case to the trier of the facts we suggested that the reason we believed plaintiff had carried its burden generally on the issue of damages is that "there is in evidence * * * the audit reports and the basic data that related to the conduct of the plaintiff's business from which a trier of the fact can ascertain what actually went on in accordance with the requisite rules that are applicable to the ascertainment of damages" (Tr. 892). There is no question, as our findings of fact determine, that plaintiff was in fact damaged.

While we are convinced that there is substantial evidence of damage in this record, that does not answer the question of how that evidence, together with other relevant evidence concerning what profits were in fact realized on the business wrongfully taken from the plaintiff, can be best organized for fair analysis. Certainly there should be a better method than having a judge, untrained and unassisted in matters of accounting, sift the raw material of original accounting records for the purpose of ascertaining plaintiff's damage. When we were at the Bar we did not dream that we could intelligently approach such a difficult task without the aid and assistance of a qualified accounting expert.

Our tedious and almost vexed attempt to decide the damage issue in this case without the benefit of expert guidance convinces us that becoming a judge did not vest us with powers we knew we did not possess as a lawyer. We quite agree with plaintiff's pre-trial statement that "it should not be the burden of the Court to compile tables from an accountant's testimony," not because of the obvious work involved, but because a judge simply is not trained to perform accounting duties.

Throughout the pre-trial proceedings and throughout the trial itself we attempted to focus attention on the difficulties inherent in the proof of any case involving the loss of anticipated profits. For easy reference, and for the purpose of pointing to a well known Eighth Circuit case in which a plaintiff had his judgment taken away from him in an appellate court, we made frequent reference to Judge Walter Sanborn's often cited opinion in Central Coal & Coke v. Hartman, 8 Cir. 1901, 111 F. 96. We pointed out both before and during the trial that Judge Ridge, when a member of this Court, had held in Siegfried v. Kansas City Star Co., W.D.Mo.1961, 193 F.Supp. 427 at 437, that Central Coal and Coke "remains the law to this day" and that the Court of Appeals, in affirming Siegfried, had expressly relied upon Central Coal and Coke. (See Siegfried v. Kansas City Star Co., 8 Cir. 1962, 298 F.2d 1 at 7. See also National Wrestling Alliance v. Myers, 8 Cir. 1963, 325 F.2d

768, in which Siegfried is most recently followed by the Eighth Circuit.)

Siegfried, of course, followed and was based on the well known Supreme Court cases of Eastman Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), (in which Central Coal & Coke was discussed at 376 of 273 U.S., at 404 of 47 S.Ct.); Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); and Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Indeed, when plaintiff stated at the outset of the trial that its theory of damages was going to be based "on our own books and records" and upon *the information furnished us by the defendants as to their experience with these schools"* (Tr. 9–10), we anticipated that evidence would be adduced as to exactly how much profit defendants had actually realized from the business that they illegally obtained from plaintiff.

The comparison of a competitor's business permitted in Bigelow was more inexact than the comparison that can be, but which has not yet been, made in this case. In this case it should be possible to follow the precise business that was wrongfully taken from plaintiff by the defendants and to ascertain with reasonable certainty what profits were actually made on that business.

Not only was that available evidence not introduced, no precise accounting analysis has yet been made of the mass of underlying factual data that relates to plaintiff's business that has been admitted in evidence. Plaintiff's actual presentation of its evidence on damages has had the practical effect of imposing that burden on this Court. As we have suggested, we do not believe that we can, with fairness to all the parties, carry that burden without expert aid and assistance. Simply stated, we lack sufficient accounting training to be sure that we can perform that task fairly to all parties concerned.

We are convinced that the law does not contemplate that a judge is to be forced to enter upon tasks of accounting that have little relation to the exercise of any judicial function. And because we are a judge and not an accountant we are not at all sure that the present record includes all pertinent accounting data, particularly accounting data as to what profits were actually made or ultimately resulted from the business illegally taken from plaintiff, on which a fair determination of damages should be based. We feel the need of expert assistance on that score as well as the other problems that we have mentioned.

█ It is hornbook law that "when the judge realizes in a case yet under advisement important proof depends on evidence * * * which may be supplied, he should on his own motion reopen the case to admit further proof" (quoted from Section 31.108 of 9 Cyclopedia of Federal Procedure at 435, Third Edition). For Eighth Circuit cases, see Paine v. St. Paul Union Stockyards Co., 8 Cir. 1928, 28 F.2d 463 at 467, and G. Paine v. St. Paul Union Stockyards Co., 8 Cir. 1925, 7 F.2d 855 at 859.

And see also J. W. Paxson Co. v. Board of Chosen Freeholders, 3 Cir. 1912, 201 F. 656 at 662. In that case the trial court in a non-jury case, on its own motion, twice ordered the case reopened on the question of damages alone. Cf. Paragraph 59.04 [13] of 6 Moore's Federal Practice 3722, et seq.

Our experience in this case convinces us that not only should we order this case reopened to receive further evidence in regard to the damage issue, but that Rule 53 of the Rules of Civil Procedure must be utilized in order that the judicial time of this Court be conserved.

Since 1961 the two judges who have had the responsibility for seeing that this case be tried have been spectacularly unsuccessful in their efforts to get the plaintiff to prepare and present its case on damages in a manner that can be judicially understood. We recognize,

of course, that neither the general condition of the docket of this Court nor the fact that there are presently only two district judges on active service on this four judge court are valid grounds for directing a reference, even as to matters of accounting.

We also recognize that "[a] reference to a master shall be the exception and not the rule," as expressly provided in Rule 53(b). But we must further recognize that something different must be done in this case from what has been attempted in the past if this case is ever to come to an end.

The fact that counsel for the plaintiff has not been able to communicate with us may well mean that we have not been successful in our efforts to communicate with counsel. It may even mean that neither of us have sufficient accounting knowledge to communicate with each other.

Certainly we were most surprised when we reached page 27 of plaintiff's brief in support of its suggested findings of fact to read that "the next portion of this brief was basically prepared by [plaintiff's expert witness] but was revised and edited and is adopted by counsel for plaintiff." In other words, roughly one half of plaintiff's brief (pages 29 to 54) was written by an accountant and was based in large part on references to various accounting authorities not in evidence in this case. Only three exhibits in evidence were referred to and only two pages of the record were cited.

Perhaps another accountant would know whether the basic assumptions made by that accountant are correct and perhaps another accountant would fully understand what plaintiff's expert witness was trying to communicate in his secondary (or perhaps even primary) capacity as an advocate. We confess that we do not know. But we do know that we are not going to render any verdict on damages until we do understand what we are doing.

The issues concerning damages are obviously complicated. Most, if not all, calculations of loss of future profits must be placed in that category. Decision on those issues turn primarily on questions of accounting. A reference is needed in order that accountants may talk to a master with accounting knowledge whom the Court knows to be disinterested and impartial. A bridge of communication must be built so that this Court can know that its ultimate verdict will be based upon reason.

■ We are confident that an order of reference may be drawn under the provisions of Paragraph (c) of Rule 53 that will direct the master to receive particular accounting evidence, to do and perform particular acts in regard to that evidence, and to make an appropriate report that will enable this Court to render a just verdict.

While the blanket reference of all issues in an anti-trust case was condemned in La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), that case recognized that had Judge LaBuy referred only the voluminous accounting problems to a master, the result of that case would have been different. The Supreme Court held that "[w]e agree that the detailed accounting required in order to determine the damages suffered by each plaintiff might be referred to a master after the court has determined the over-all liability of defendants, provided the circumstances indicate that the use of the court's time is not warranted in receiving the proof and making the tabulation" (352 U.S. at 259, 77 S.Ct. at 315). We are convinced that this case falls within that rule.

Judge Miner followed the procedure we have indicated we intend to follow in an anti-trust case and the Court of Appeals for the Seventh Circuit affirmed in Switzer Brothers, Inc. v. Locklin, 7 Cir. 1961, 297 F.2d 39. That case held that "[t]he reference of the case to a master for determination of the amount of damages is a proper procedure," citing

the portion of La Buy just quoted. See and compare Judge Hincks' reference in a jury anti-trust case in Connecticut Importing Co. v. Frankfort Distilleries, D.C. Conn.1940, 42 F.Supp. 225.

## ORDER DIRECTING FURTHER PROCEEDINGS

No judgment of any sort, of course, can yet be entered in this case. In order to direct further proceedings and to implement what we have determined, we order that:

1. Within fifteen (15) days each of the parties shall submit a suggested form of order of reference drawn pursuant to Rule 53 of the Rules of Civil Procedure consistent with what we have above stated. All suggested forms shall include a provision that the compensation to be allowed the master shall be fixed by the Court and appropriately charged at the time final judgment is rendered.

2. The parties shall confer within ten (10) days to ascertain whether they can agree upon a recommendation of a particular master to whom they would like the question of damages to be referred. We direct attention to that portion of paragraph (a) of Rule 53 that provides that "the word 'master' includes * * * an auditor * * *". In other words, counsels' recommendation to the Court is not limited to lawyers; certified public accountants are eligible for appointment under Rule 53.

3. If the parties are able to agree upon the recommendation of a particular person to serve as master, the Court shall be so advised at the time the suggested forms of order are filed pursuant to paragraph 1 above.

4. If the parties are unable to agree on a single recommendation, each party shall separately recommend the names of three persons whom they believe are qualified to serve as the master. In this event, the recommendations of each party shall be filed by each party at the same time the suggested form of order required by paragraph 1 is filed.

5. We, of course, encourage agreement of any and all parties to the suggested form of the order of reference required in paragraph 1 and like agreement on any recommendation of particular person for master. If all parties can not agree, we welcome joint submissions on the part of any two of the parties.

6. After we have had an opportunity to study the suggested form or forms of order and the recommendation or recommendations concerning the master, a conference will be scheduled to discuss those and all other matters deemed necessary for the just, speedy, and inexpensive determination of this case.

7. Counsel shall list any matters they believe should be included on the agenda for that conference in a separate document to be filed contemporaneously with the other filings herein required.

It is so ordered.