RESERVE PLAN, INC., Plaintiff,

v.

ARTHUR MURRAY, INC., et al.,
Defendants.

No. 12701–1.

United States District Court
W. D. Missouri, W. D.

Jan. 25, 1967.

Ralph M. Jones, Kansas City, Mo., for plaintiff.

William H. Curtis, Elton L. Marshall, Kansas City, Mo., for defendants.

MEMORANDUM OPINION, SUPPLE-
MENTAL FINDINGS OF FACT
AND SUPPLEMENTAL CONCLU-
SIONS OF LAW

JOHN W. OLIVER, District Judge.

I.

The Court of Appeals' opinion reported in 8 Cir., 364 F.2d 28, directed that particular portions of our original order of reference reported in D.C., 38 F.R.D. 23 at 37 be vacated. In addition, that opinion established the guidelines for the final disposition of this case. After receipt of the mandate we modified the order of reference to comply with the directions of the Court of Appeals.

The fact that the Special Master gave a negative answer to the precise question

referred to him under the modified reference order does not mean that plaintiff is only entitled to nominal damages. That fact does mean that defendants' objections to the particular portions of the Special Master's report identified in those objections are well taken in the sense that the explanatory comments in the report of the Special Master, as distinguished from his answer to the specific question posed in the modified order, are not and have not been considered as a part of the evidence or the record upon which this Court's additional findings of fact must be based.

The Court of Appeals based its restriction of our original order of reference on its finding that "the record contained an adequate probative basis for legally arriving at an award" (364 F.2d at 35). In so doing the Court of Appeals cited and directed significant attention to the following Supreme Court cases:

It should be sufficiently clear, we think, from Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 377–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–566, 51 S.Ct. 248, 75 L.Ed. 544 (1931), that the task and responsibility involved in arriving at the amount of damages in an antitrust case are not as formidable and precarious as the wrongdoer ordinarily in last line of defense, seeks to make them out to be. When the fact is certain that antitrust injury has been inflicted on a party, it is sufficient as a basis for arriving at the damages that the evidence contains probative elements from which on reasonable inference their extent can with judgment be estimated. Cf. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688, 66 S.Ct. 1187, 1193, 90 L.Ed. 1515 (1946); Palmer v. Connecticut Railway & Lighting Co., 311 U.S. 544, 560–561, 61 S.Ct. 379, 384–385, 85 L.Ed. 336 (1941). [364 F.2d at 35]

It is obvious that the Court of Appeals did not believe that a miscarriage of justice would occur if this case is determined solely on the evidence introduced by the plaintiff at trial. Power to require additions of evidence in a submitted jury waived case on the trial judge's own motion was recognized in the exceptional circumstance in which such an addition would in fact be necessary to "prevent a miscarriage of justice from occurring" (364 F.2d at 34). The Court of Appeals held that exercise of such power was warranted when, but only when, the facts of a particular case required such exercise in order "to have some element of necessary and available proof added to the record to avoid having to do an injustice in the situation" (364 F.2d at 35).

It is clear that the Court of Appeals did not believe that this case, on its facts, could be said to fall within the recognized exception to the general rule that the trial judge, as the trier of the facts in a jury waived case, must decide the case solely on the evidence adduced by the parties before submission.

██ The citation by the Court of Appeals of Stoll v. Gottlieb, 305 U.S. 165 at 172, 59 S.Ct. 134, 83 L.Ed. 104, with an emphasis different from that which we originally placed on that case, see 38 F.R.D. at 25, negates any notion that in a jury waived case the trial judge has power to order a new trial in the event he is dissatisfied with the state of the record; there is, in other words, no legal possibility for a hung jury in a jury waived case. We have endeavored to comply with the directions and admonitions of our Court of Appeals in the manner we now state. The findings of fact and conclusions of law stated in this memorandum opinion are supplemental to those stated in 38 F.R.D. 23, which are incorporated herein by this reference, and all shall be so considered pursuant to Rule 52(a) of the Rules of Civil Procedure.

## II.

After receipt of the negative report of the Special Master, it was apparent that our verdict and supplemental findings of fact on damages must necessarily be based solely on the evidence adduced at trial. Our order of December 1, 1966 therefore directed that plaintiff submit "a specific finding of fact in regard to the amount of damage plaintiff believes is supported by the evidence in this case" and that plaintiff "support his suggested finding by specific references to the record and add appropriate factual and legal arguments." Appropriate leave was also then granted defendants to file additional briefs on the question of damages and to plaintiff to reply.

In response to that order plaintiff resubmitted as its suggested finding No. A its original suggested finding No. 47 altered only by a recalculation of certain interest figures to increase the alleged damage claim from $528,122.00 to a claim for $609,062.00. We reject and refuse to make that suggested finding because there is not and, in our judgment, never has been sufficient evidence in the trial record to support such a finding. The Court of Appeals noted that full development of the factual base upon which any finding in regard to the capital-stock purchase involved "prospecting for further evidential possibilities," a quest expressly prohibited by the Court of Appeals' mandate. But more important, the Court of Appeals added that "even if the quest should prove out, such evidence would be capable of at most only auxiliary and not crucial probativeness in the situation" (364 F.2d at 34). We agree with the clear implication of the Court of Appeals' comment on the state of the evidence adduced by plaintiff in regard to the capital-stock purchase matter. Indeed, if we had ever had any different view of that evidence we would not have issued our original order of reference in the manner and form in which that order treated with the capital-stock purchase problem.

■ Plaintiff's suggested alternative finding of fact No. A is based upon an application of Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400. We find and determine that the rule and rationale of *Eastman* is a proper and available method under which plaintiff's damages may be established. As will be detailed in the next section of this memorandum opinion, we reject the particular figures contained in plaintiff's suggested finding. We also reject plaintiff's suggested finding that its proof established that plaintiff's damage continued beyond the date suit was filed.

We likewise reject plaintiff's suggested finding No. B because plaintiff did not establish that but for the defendants' actions it would not have suffered the capital losses for which claim is made.

We accept plaintiff's suggested finding No. C in regard to the loss of Arthur Murray studio coupon books.

## III.

The basic data on which our findings of fact in regard to damages must be based is beyond dispute. Defendants' exhibit 106 is a fair and accurate summation of the auditor's reports introduced as plaintiff's collective Exhibit 53. The undisputed evidence establishes beyond any real doubt that the Arthur Murray business handled by the plaintiff was its most lucrative business and could therefore be handled at less cost than its other business. Estimates of cost based on plaintiff's entire business operation are therefore more favorable to the defendants than to the plaintiff. We are forced to utilize plaintiff's overall business performance because plaintiff failed to adduce any evidence that distinguishes between the expense of its overall business and its separate Arthur Murray business. We so find.

We find and determine that plaintiff introduced sufficient evidence to support the theory of damages approved in *Eastman*. On the basis of our study of the evidence adduced at trial and the reasonable inferences drawn therefrom, we find that the gross annual income

from the Arthur Murray business for the calendar year immediately preceding April 1, 1955 to be $120,000.00. We have rounded figures calculated from the audit reports, keeping in mind the fact that plaintiff's books reflected income only when particular installment contracts were collected in full. We recognize that our figure is somewhat lower than that calculated by the Special Master but, as we have indicated, the Special Master's report is not to be considered as evidence in this case. We so find.

As we have indicated above, we reject that portion of plaintiff's suggested alternative finding No. A that suggests that it would have been necessary to incur only $22,800 additional expense to handle the additional $120,000 of business. We expressly find that such portion of plaintiff's suggested finding is contrary to the experience of plaintiff's established business and to other testimony and evidence in the record.

There was no real dispute in the evidence in regard to the particular items of expense included in plaintiff's exhibit 58. Defendants' expert witness did not suggest that the items there listed were not proper nor was there any evidence that additional items should have been included. The total thrust of defendant Arthur Murray's expert witness testimony was to the effect that it was impossible to arrive at any amount of damage to plaintiff because plaintiff did not keep its books in a manner that would permit a precise allocation of income and expense with respect to plaintiff's Arthur Murray business and plaintiff's other business (Tr. 991–994). Defendant's expert testified that he had made a tabulation of plaintiff's income and expense statements (Tr. 1005). That tabulation was the summation of plaintiff's audit reports introduced in evidence as DX 106 (Tr. 987). Defendant's expert first testified that the income and expense tabulation proved nothing (Tr. 1005). He later conceded that DX 106 did at least establish that "there is an almost direct relationship

between increases in income and expenses" (Tr. 1007). We believe that the data summarized in DX 106 proves a great deal more. We are convinced that in the absence of any evidence to the contrary, the particular items of expense set forth in PX 58 may fairly and must therefore be considered as the proper items of expense to be considered in our evaluation of all of the evidence. We so find.

While it is clear that plaintiff would have been required to make all the expenditures it estimated it would have to make as set forth in PX 58, other evidence establishes that some of plaintiff's estimates are unreasonably low. We find plaintiff's total additional expenses for handling the $120,000.00 additional discount income to be at least $60,000.00. We so find for the reasons we now state in detail.

IV.

In order to estimate the expense of handling an increase of $120,000.00 discount income on plaintiff's business, we have examined for comparative purposes the fiscal years 1951 and 1952 as one period and fiscal years 1954 and 1955 as a later period. In fiscal 1951 and 1952 plaintiff had an average annual discount income of $115,726.85 ($110,642.85 in 1951; $120,810.85 in 1952). In fiscal year 1954 and 1955 plaintiff had an average annual discount income of $221,859.79 ($213,101.67 in 1954; and $230,617.92 in 1955). The increase in discount income between the two averaged periods was $106,132.94.

Our study of plaintiff's full business performance over all its years of operation established that a fair reflection of the effect on expenses by an increase in business can be illustrated by comparing the expenses of the two selected periods where the discount income increased $106,132.94.

While the additional discount income spread between the two periods is only $106,132.94, rather than $120,000.00, that fact is unimportant for present discussion because the purpose of the com-

parison is to illustrate the fact that plaintiff's $22,800.00 estimate is not supported by the evidence. It is obvious that if plaintiff could not handle $106,-132.94 additional discount income for a figure close to $22,800, it most certainly could not handle $120,000.00 additional income for such a figure.

We examine plaintiff's notion that only $9,900 would have been required for additional salaries to handle the additional $120,000.00 annual discount income. Plaintiff actually spent an average of $69,433.16 on other than executive salaries in fiscal years 1954 and 1955 ($63,547.91 in 1954; $75,318.42 in 1955) as compared to an average expenditure of $30,295.79 for such salaries during fiscal years 1951 and 1952 ($28,333.68 in 1951; $32,257.91 in 1952). The difference in plaintiff's expenditures on other than executive salaries spent on the average in fiscal years 1954 and 1955, as compared to the average spent in fiscal years 1951 and 1952 was $39,137.-37. On the basis of that comparison, plaintiff underestimated additional salaries for other than executive salaries by $29,237.37.

It should be noted that this calculation does not take into account the fact that the pattern generally reflected by plaintiff's full business experience in regard to the amount of executive salary paid plaintiff's president was that, generally speaking, he drew a salary in excess of the $25,000 when the volume of annual discount income was greater than it was in the 1951–1952 period (the year 1953 was an exception; plaintiff's president elected to draw no salary in that year). Such was certainly true in fiscal year 1954 in which plaintiff's president was paid $40,402.58. We do not agree with the suggestion in some of the briefs, as distinguished from any evidence adduced by defendants, that a portion of plaintiff's president's executive salary should properly be allocated to the expense of handling the additional discount income. We find that plaintiff properly omitted that item from those listed in PX 58.

The $5,000 postage estimate and the $4,000 stationery and supply estimate, the two highest items next to salaries, are quite realistic tested by the same sort of comparisons. The evidence shows that the postage expense for fiscal year 1955 in the amount of $21,448.26 was inflated by $8,955.00 charged to postage expense in that year that was not in fact spent in 1955 (Tr. 799). Taking that fact into consideration, the average spent in fiscal 1954 and 1955 for postage was $11,736.88 ($10,980.51 in 1954; $12,493.-26 in 1955 [$21,448.51 less $8,955.00 not actually spent in that year]) as compared to the average spent in fiscal 1951 and 1952 of $6,917.41 ($4,985.40 in 1951; $8,849.42 in 1952). $4,819.47 more was spent on an average for postage in fiscal 1954 and 1955 than the average spent in the years fiscal 1951 and 1952; a figure that compares favorably with plaintiff's $5,000 PX 58 estimate for additional postage cost. Plaintiff's $5,000 postage estimate exceeded the difference between the average actual expenditures by $180.53.

Substantially the same picture is presented in regard to plaintiff's $4,000 stationery, printing, and supplies PX 58 estimate. An average of $15,397.84 was spent on that item in fiscal 1954 and 1955 ($13,573.90 in 1954; $17,221.79 in 1955). An average of $11,624.57 was spent in fiscal 1951 and 1952 ($12,819.55 in 1951; $10,429.59 in 1952). The $3,773.27 difference in the average expenditures compares favorably with plaintiff's $4,000 PX 58 estimate. Plaintiff's estimate exceeded the actual performance by $226.73.

Without detailing the calculations which followed the pattern just described, we state the differences between the average expenditures in the two periods and plaintiff's estimates in regard to the remaining items set forth in PX 58. Plaintiff's PX 58 payroll tax estimate of $400.00 exceeded the difference between the average expenditures for that item by $170.03. Plaintiff's PX 58 $1,000 estimate for additional travel was

$1,846.45 less than the difference between the average expenditures in the two periods. Plaintiff's PX 58 miscellaneous estimate of $1,000.00 was $1,096.92 less; plaintiff's PX 58 telephone and telegraph estimate of $300.00 was $2,769.91 less; plaintiff's PX 58 collection item of $600 was $697.23 less and plaintiff's PX 58 estimate for entertainment expense was $220.86 less than the difference between the average expenditures for the two periods. Plaintiff's PX 58 service and maintenance estimate of $300.00 exceeded the average expenditures by that exact amount because no amounts for service and maintenance were expended in either the fiscal 1951–1952 or fiscal 1954–1955 periods.

It is apparent from the comparison of the average expenditures actually made in the fiscal 1951–1952 period with the actual average expenditures made in the fiscal 1954–1955 period in regard to the particular expense items included in plaintiff's PX 58 estimate of $22,800 that plaintiff underestimated its contemplated expenses by $35,868.74. It has been noted that plaintiff overestimated five of its PX 58 items in a total amount of $877.29. When that factor is taken into account it is apparent that plaintiff's total average expenditures for the items contained in PX 58 estimate in the fiscal 1954–1955 period exceeded the average expenditures made in connection with those items during the fiscal 1951–1952 period by $57,791.55. In other words, plaintiff actually spent $58,668.74 more on the average in the 1954–1955 period on the items included in PX 58 than it spent on the average during the 1951–1952 period in order to handle the $106,132.94 excess discount income. We are convinced that these facts alone demonstrate that the estimate contained in PX 58 and the testimony in support of it can not properly be used as the basis of any finding in regard to the amount of plaintiff's additional expense to handle the increased discount income. Similar calculations made in connection with other years of plaintiff's business operation need not be stated in detail. We state that such calculations, when considered in light of all the other facts and circumstances, corroborate the conclusions that we have stated in detail in regard to the comparison of average expenditures in the 1951–1952 and 1954–1955 periods. We so find.

## V.

■ Our demonstration of the reasons why we believe particular amounts for items of plaintiff's estimate as set forth in PX 58 are unrealistic and our determination that particular amounts in that estimate failed to relate reasonably to past average expenditures for those particular items does not mean that it must be held that there is not sufficient evidence in this record upon which a reasonable estimate of plaintiff's additional expenditures may be based. We are under duty to pay appropriate heed to the Court of Appeals' citation of the controlling Supreme Court cases and its admonition that "the task and responsibility involved in arriving at the amount of damages in an antitrust case are not as formidable and precarious as the wrongdoer ordinarily, in the last line of defense, seeks to make them out to be." We have approached that task and responsibility fully cognizant of the rule that the basis of plaintiff's damage computation must be reasonable, as distinguished from speculative.

Our detailed examination of the audit reports and re-examination of all the facts and circumstances in evidence, tested as we have indicated by calculations and comparisons not dissimilar from those just stated, convinces us that the $60,000.00 cost of handling the $120,000.00 additional discount income is a reasonable estimate supported by the evidence adduced at trial. That figure adopts and accepts the formula that plaintiff's additional costs may fairly be estimated to equal fifty per cent of the additional gross annual discount income to be handled.

The prime difficulty with this case from the outset has been fully stated

elsewhere (see 38 F.R.D. 23). Plaintiff's failure to settle on and to adduce evidence in direct support of a consistent theory of damages resulted in, among other things, a sometime oblique examination of plaintiff's witnesses. In spite of those difficulties, it must be said that evidence was in fact introduced by the plaintiff that supports inferences that we have independently drawn from all the facts and circumstances in evidence. We believe that such evidence is consistent with those inferences and must therefore be recognized as additional and independent support for the ultimate facts as we have found them. We so find.

On page 837 of the record plaintiff's president was asked how he would establish the value of the unpaid balance of Arthur Murray notes held by plaintiff on April 1, 1956. He testified that plaintiff had already paid the expense of acquiring and putting those notes on the books so that "the only remaining expense to us was the routine of collecting the accounts" (Tr. 837–838). He explained that such expense would be in addition to its fixed expenses (Tr. 838) and testified that the actual collection expense of the accounts was about two per cent of the face amount of the notes but that if "all the expense, including the fixed expense" was included one would "come up with about five per cent, *about half the discount*" (Tr. 839, emphasis ours). The five per cent figure is of course the signficant figure because any fair calculation under the facts and circumstances of this case must include plaintiff's fixed expenses. But even more significant is plaintiff's testimony that the five per cent would in fact equal "about half the discount." We find that plaintiff's estimate is supported by the actual experience of plaintiff's company as reflected by the documentary and other evidence in this case.

The $60,000 estimate in regard to the amount of plaintiff's additional expenditures is consistent with the nature of the business to be handled and how similar business was handled in the past. Application of the fifty per cent formula, for example, to the additional cost of handling the additional annual discount income in the 1954–1955 period as compared to the 1951–1952 period, to which we made earlier reference for a different purpose, illustrates the general experience of the operation of the plaintiff company. The figures stated earlier illustrate that the additional cost of handling the additional annual discount income in the 1954–1955 period were slightly more than 50%. The general rise in the cost of doing business could be said to account for that slight variation.

We are the first to concede that the basis of our computations and our use of the formula are mainly based on circumstantial evidence and can not be said to represent calculations of absolute exactness. We are persuaded, however, that the Court of Appeals has clearly indicated that this case calls for the application of the stated rule of *Eastman*— "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible" (273 U.S. at 379, 47 S.Ct. at 405). We are also convinced that the Court of Appeals intends that cases such as Siegfried v. Kansas City Star, 8 Cir. 1962, 298 F.2d 1, National Wrestling Alliance v. Myers, 8 Cir. 1963, 325 F.2d 768, McCleneghan v. Union Stock Yards of Omaha, 8 Cir. 1965, 349 F.2d 53, and American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir. 1966, 360 F.2d 977 at 995–996, are to be read in light of the factual context of each of those cases and not as establishing any rule of proof of damages any more strict than that established by the Supreme Court cases cited by the Court of Appeals in this case. For the reasons stated, we have found and determined that a fair estimate of the cost of handling the additional income to be $60,-000.00.

## VI.

There remains the question of whether the damage period should be calculated to end (a) November 21, 1958, the date the consent decree was entered; (b) January 31, 1959, the date when the defendant companies terminated all contracts with Arthur Murray licensees in accordance with the requirements of the consent decree; (c) the date suit was filed; or (d) the date of trial. Defendants argue that plaintiff failed to adduce any evidence that the consent decree had been violated; that it must be presumed that such decree was complied with; and that therefore defendants are at least not liable for any damage suffered by reason of plaintiff's failure to recover the business lost after the consent decree was implemented.

■ Plaintiff contends that its proof of damage brought this case within the rule recognized in Volasco Products Company v. Lloyd A. Fry Roofing Company, 6 Cir. 1965, 346 F.2d 661 at 666. We find and determine on the facts as we find them that the arguments of both parties in support of a cutoff date other than the filing of the suit are not tenable and that the period of damage should be calculated on that basis.

## VII.

■ We accordingly find and determine the ultimate facts that the gross annual income of plaintiff from Arthur Murray business for the year prior to April 1, 1956 was $120,000.00; that the additional expense for handling that business would have been $60,000.00; that plaintiff's annual loss of future profits must be said to equal $60,000.00 per year; that the damages up to the time of filing suit, three years and ten months after the taking, would therefore equal $230,-000.00; that plaintiff is also entitled to $2,500.00 for the Arthur Murray coupon books; so that plaintiff's total damage equals $232,500.00.

■ Plaintiff shall, within two (2) days, prepare and submit to opposing counsel for approval as to form, and file a form of appropriate judgment, trebling the damages as found, and submit appropriate data in support of what it believes to be a reasonable attorney's fee. We are advised that the Special Master devoted time equivalent to four full days to the preparation of his report. We believe a fee of $600.00 is reasonable. Unless counsel for either side have some objection to that amount, plaintiff shall include that allowance in the form of judgment, the cost of which shall be assessed against plaintiff.

It is so ordered.