ARTHUR MURRAY, INC., Appellant,
v.
RESERVE PLAN, INC., Appellee.

EDUCATIONAL CREDIT BUREAU, INC. and Tuition Plan, Inc., Appellants,
v.
RESERVE PLAN, INC., Appellee.

Nos. 18970, 18971.

United States Court of Appeals
Eighth Circuit.

Feb. 5, 1969.

Rehearings Denied March 13, 1969.

---

Allan L. Bioff, of Watson, Ess, Marshall & Enggas, Kansas City, Mo., for appellant in No. 18970; Elton L. Marshall and Landon H. Rowland, of Watson, Ess, Marshall & Enggas, Kansas City, Mo., on the brief.

William H. Curtis, of Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., for appellants in No. 18971; Martin J. Purcell, of Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., on the brief.

Ralph M. Jones and Richard K. Andrews of Swanson, Midgley, Jones, Eager & Gangwere, Kansas City, Mo., for appellee.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

This is a private antitrust suit brought under §§ 1 and 2 of the Sherman Act seeking treble damages under § 4 of the Clayton Act.[1] The parties waived a jury trial and the case was tried to the District Court for the Western District of Missouri. Plaintiff-appellee, Reserve Plan, Inc., was awarded treble damages in the amount of $697,500.00, plus costs, and an attorneys' fee of $40,000.00. After submission here, Reserve Plan moved for an additional attorneys' fee of $21,300.00.

For clarity, Reserve Plan, Inc. will hereafter be referred to as plaintiff. Defendants Arthur Murray, Inc., Educational Credit Bureau, Inc. and Tuition Plan, Inc. will be referred to collectively as defendants and individually as AMI, ECB and TPI, respectively. Plaintiff and ECB and TPI are finance companies. AMI is engaged in franchising Arthur Murray Dance Studios throughout this country and abroad, and in 1955 and 1956 had franchise agreements with some 325 to 350 studios in the United States. These studios will be sometimes referred to herein as licensees. Under terms of the franchise agreements, the licensees pay royalties to AMI, which usually amount to approximately 10% of the gross receipts of each studio, for the use of the Arthur Murray name and method of teaching dancing.

On March 28, 1956, AMI issued a release to all of its studios restricting the financing of loans for dance lessons sold by its franchised studios to three finance companies—the defendants TPI and ECB (of Kansas City) and a third company ECB of New York, which latter company was dissolved prior to this suit and the stock acquired by defendant ECB of Kansas City.[2] All three of the aforementioned finance companies were sponsored by AMI, which loaned the companies capital and whose officials assisted in the corporate organization. The stockholders of AMI and the three finance companies were composed of people from the same groups—members of the Murray family, officers and em-

---

1. 15 U.S.C.A. §§ 1, 2 and 15.

2. The release sent out by AMI to its licensees on March 28, 1956 appears in Appendix Number 1.

ployees of the companies and their families, and Arthur Murray licensees.[3] Plaintiff was one of twenty-seven independent finance companies and banks doing business with the AMI licensees on the date of the March 28, 1956 release. By April of 1956, plaintiff had lost all of the Arthur Murray business with the exception of two accounts, one in Jackson, Mississippi and the other in Waco, Texas, which were later lost.

Broadly stated, the issues here are (1) the liability of the defendants and (2) the alleged excessiveness of the damages as computed by the district court.

We agree with the district court's conclusion as to defendants' liability and also agree with the method utilized by the district court in computing damages, but we think the district court erred in failing to include in plaintiff's expenses any part of the executive salary in its handling of the AMI business which we think should have been considered and added to plaintiff's expenses in order to properly compute the amount of damages. We also note what appears on the surface, at least, to be a failure on the part of the district court, in computing the income which plaintiff lost from AMI accounts during the three-year, ten-month period for which it was awarded damages, to take into consideration the record evidence concerning the deferred discount income which plaintiff received from AMI accounts during this period. For these reasons, we vacate the judgment entered in the district court and remand the case for recomputation of the damages to be awarded.

This case, a complex one, has had a thorny history since its inception. It was nearly four years after the suit was filed before the case finally came to trial on January 7, 1964. Thereafter, in a memorandum opinion issued on July 21, 1965 in a case styled Reserve Plan, Inc. v. Arthur Murray, Inc., 38 F.R.D. 23 (1965), Judge Oliver held that the defendants had violated the Sherman Act as charged and were liable to plaintiff for treble damages, but did not fix the amount of the damages. The court stated that in order to arrive at a reasonably accurate amount of damages, it would be necessary for the case to be referred to a master who was an accountant, with directions to receive particular accounting evidence and make an appropriate report which would enable the court to render a just verdict. Defendants petitioned this court for a writ of mandamus or prohibition to prohibit the district court from carrying out its order to appoint a special master to examine not only the evidence adduced by the parties at the trial but in addition to engage in a scrutiny of other indicated material, consisting of " 'all accounting records, income tax returns, balance sheets, contract documents, business and accounting correspondence and the like', which could be reflective of the profits derived by defendants Educational Credit Bureau, Inc., and Tuition Plan, Inc., from the business which plaintiff had been de-

---

3. David Teichman, a brother of Arthur Murray, testified that in 1955 and 1956 approximately 55% of the stock of AMI was owned by AMI licensees, approximately 20% by members of the family of Arthur Murray and Kathryn Murray, his wife (although Arthur and Kathryn did not own any of the stock themselves), and that the remainder of the stock was owned by AMI and its employees. (At that time, Teichman was Vice-President, Treasurer and Business Manager of AMI.)

In 1956, Arthur Murray, Teichman and his wife, Robert Norman (Kathryn Murray's brother), and Rebecca Roman (Arthur and Kathryn Murray's daughter) together owned over 40% of the stock in ECB–KC and W. E. Gregory, Manager of ECB–KC, owned over 10%. (Teichman, Robert Norman and Kathryn Murray were members of the Board of Directors of ECB–KC in 1956 and Norman was its Vice-President.) Teichman and his wife owned 55% of the stock of ECB–NY and Kathryn Murray's brother had an additional 20%. Two brothers of Arthur Murray and the wife of one owned over 22% of the stock of TPI and Gregory and Charles E. Redhair, Manager of TPI, owned over 7% each. (Teichman managed ECB–NY and Teichman and Redhair were members of the Board of Directors of TPI.) Reserve Plan, Inc. v. Arthur Murray, Inc., 38 F.R.D. 23, 29–30 (W.D.Mo.1965).

prived of, involving some 45 accounts." Arthur Murray, Inc. v. Oliver, 364 F.2d 28, 30 (8th Cir. 1966). In the opinion of this court in Arthur Murray, Inc. v. Oliver, *supra,* we held that the district court had the authority under the Federal Rules of Civil Procedure to refer the case to a special master to make an accounting analysis, even though the trial had been concluded and the case submitted to the court for its determination, but that the court could not engage in a prospecting quest for other evidence to add to the record nor appoint a master to do so unless such evidence should appear to be important as a matter of preventing injustice and, also, reasonably available. We held that under the particular factual situation involved, the reference should not be permitted to stand except as to the auditing of the plaintiff's books and records. Therefore, the petition for the writ prohibiting reference to the master for auditing the books was denied, and as to the other aspects of the reference the district court's order was directed to be vacated.

On September 12, 1966, Judge Oliver issued his modified order of reference to a master wherein he referred to the master the plaintiff's audit records and income tax returns with directions that the master report as to whether from these records he could make a reasonably accurate calculation of the profits earned by plaintiff on its Arthur Murray studio business in the years prior to April 1, 1956. Thereafter, the master filed his report with the district court stating that it was impossible for him to calculate a reasonably accurate profit earned on the Arthur Murray business. This, however, can be readily understood in view of the fact that in the operation of plaintiff's business it did not segregate the expenses which it incurred in handling the Arthur Murray accounts from its expenses on other accounts, and there was no reason why it should do this in order to keep a proper set of books. This, however, precluded a certified public accountant from stating with precise definiteness the exact amount of profits which plaintiff realized from the Arthur Murray accounts.

Thereafter, Judge Oliver did the only thing left for him to do, that is, he waded through the various accounting records and exhibits in an effort to make a reasonable calculation himself. He was able to ascertain from them plaintiff's gross income from the Arthur Murray business for the year preceding April 1, 1956, and also the ratio of expenses to income in prior years. By applying this formula, which will be discussed in more detail hereafter, he arrived at a total damage of $232,500.00 and directed that a judgment be prepared trebling the damages, fixing a fee of $600.00 for the special master, and directing that counsel submit appropriate data in support of a reasonable attorneys' fee. Upon agreement of the parties, the court later fixed the attorneys' fee at $40,-000.00, with the further agreement that if the judgment were reduced the fee would be reduced proportionately. The district court's memorandum opinion, with the supplemental findings of fact and conclusions of law, is reported as Reserve Plan, Inc. v. Arthur Murray, Inc., 262 F.Supp. 565 (W.D.Mo.1967).

Judge Oliver found from a study of the evidence and the reasonable inferences drawn therefrom that plaintiff's gross annual income received from Arthur Murray business for the calendar year immediately preceding April 1, 1956 was $120,000.00. Based on the plaintiff's audit reports, Judge Oliver determined that $60,000.00 annually was a reasonable estimate of the additional expense incurred in the handling of the AMI accounts. Thus, the court concluded that plaintiff's annual profit for the year on AMI accounts would be approximately $60,000.00 and used this figure as the estimated annual profit which plaintiff lost from AMI business from March 28, 1956, when the release was sent out, to February 9, 1960, when the suit was filed, which was for a period of three years and ten months, or a total of $230,-000.00. The court further found that plaintiff was entitled to $2,500.00 for the

Arthur Murray coupon books which plaintiff had purchased but had not used, making plaintiff's damages $232,500.00, said damages to be trebled, which amounted to $697,500.00.

In his first opinion reported at 38 F.R.D. 23, 26–30, Judge Oliver made forty-one findings of fact relating to the liability issue and concluded therefrom that AMI's letter of March 28, 1956 to its licensees requiring that they do business with one of the three named finance companies was in violation of § 1 of the Sherman Act by compelling contracts in restraint of commerce among the several states. He also concluded that ECB and TPI, whether having knowledge that the letter was being sent or not, accepted the benefits which resulted therefrom and joined and actively participated in carrying out the combination in restraint of commerce in violation of § 1. Additionally, Judge Oliver found that the defendants combined with each other to monopolize part of the commerce among the several states in violation of § 2 of the Sherman Act.

Justification for the March 28, 1956 release was asserted by reason of habits of some of the studios in using different devices to report their gross receipts, thereby reducing royalty payments to AMI. It is singular to note that it was not even contended that plaintiff was guilty of any such practice and the trial court expressly rejected the interposed defense in its finding of fact numbered 41. In addition, AMI contended that certain of the finance companies were using objectionable collection tactics, such as bludgeoning collection letters, but again there is no contention that plaintiff or some of the other finance companies or banks were guilty of any such practice.[4]

Teichman, a brother of Arthur Murray and vice-president, treasurer and business manager of AMI, was in charge of the day-to-day business of AMI and he was responsible for sending out the release, as well as the sponsorship of financial help afforded ECB and TPI, on whose boards of directors he served.

In brief, the trial court's findings traced the relationship of plaintiff and its key employees, W. E. Gregory and Charles E. Redhair, to defendant AMI; their later association with ECB and TPI; the number of AMI studios plaintiff had as customers in 1946 when it was incorporated; its outstanding note balance; the growth of plaintiff's business; Teichman's organization of ECB of New York in 1948 to handle Arthur Murray studio notes and his employment of Gregory to manage it (he had previously left plaintiff's employ to manage an Arthur Murray studio in Kansas City); Gregory's organization of ECB of Kansas City six months later; the AMI–ECB loan agreement which provided, *inter alia*, that AMI would use its best efforts to assist ECB of New York to obtain as customers the various Arthur Murray studios to be operated in the future; the loans made by AMI to ECB; Gregory's introduction of Teichman to Redhair while the latter was still employed by plaintiff; AMI's decision to form yet another finance company; the making of arrangements with Redhair to handle said company; the AMI–TPI loan agreement; its omission of the provision contained in the AMI–ECB agreement that AMI would use its best efforts to obtain Arthur Murray studios as customers; the restrictions placed on TPI regarding purchases and loans it could make; the provision for AMI approval of compensation to be paid to officers, employees, attorneys and auditors; the initial AMI loan and its subsequent increase as needed; the testimony of former licensee customers of plaintiff that they would not have changed their business to the other companies except for the release of March 28, 1956; the relationship of the

---

4. Mr. Teichman wrote Mr. C. C. Hart, plaintiff's president, on April 13, 1956 that it was certainly not AMI's intention when issuing the March 28th release to imply that plaintiff was not operating properly or that it had not cooperated with AMI in the past.

Murray family to defendants ECB and TPI, their stock interests and directorships therein; and Teichman's testimony to the effect that as a result of the aforementioned release the three companies were expected to get all the business of the Arthur Murray studios except the business from the permanent franchisees.

We have no difficulty in agreeing with the district court that, from the facts found, defendants' actions constituted a stifling of competition to the point of eliminating its competitors, that the collaboration of ECB and TPI was monopolistic in purpose, and that the direct and necessary effect of the combination or conspiracy was to restrain legitimate competition. Defendants cite Crawford Transport Co. v. Chrysler Corp., 338 F. 2d 934 (6th Cir. 1964), asserting that it is on all fours with the instant case and that its rationalé establishes immunity from the Sherman Act provisions. There are significant differences, however, in the factual situation in the Crawford case and in the case at bar. In Crawford the action was brought by the Transport Company against Chrysler for damages based on Chrysler's alleged violation of the Sherman Act through controlling the method of transportation of vehicles to dealers. Chrysler adopted a plan providing for reducing the number of carriers whose services would be retained from 80 to 16. The object of this plan was to obtain a more efficient and economical system of distribution of Chrysler products to its dealers. It was estimated that by this plan Chrysler would save several million dollars in shipping costs.

One significant difference in Crawford and the case before us is the fact that Chrysler had a meeting attended by all of its carriers at which it announced the basis upon which the carriers would be selected and gave each carrier a right to compete for the business. It permitted consolidations, etc. and no carrier was discriminated against. Beyond that,

Chrysler had no financial interest in the carriers, no interlocking directorships, and all in all the facts in Crawford are a far cry from those here where AMI merely announced that after April 30, 1956 only the three AMI-sponsored companies would be approved for financing installment contracts for Arthur Murray dance instructions. The licensees were deprived of the right to either finance their own paper or select any other finance company, regardless of the satisfactory method of its operation.

On December 3, 1958, AMI sent to its licensees a copy of a consent decree entered into with the Government.[5] In the cover letter AMI stated that its sole concern was to make sure that Arthur Murray pupils were not harassed by strong-arm collection methods. In conclusion, the letter stated that any provision of any franchise or contract which would prevent the licensees from financing with other financial institutions approved by AMI was waived as per the decree, but that AMI reserved the right to disapprove of the use by a licensee of any financial institution on the sole ground that it engages in oppressive or deceptive practices which would be substantially injurious to AMI's good will and reputation.

It is quite clear from the record that by any reasonable criteria for the selection of finance companies, the plaintiff would be qualified to handle Arthur Murray accounts. The fact that from 45 to 48 AMI studios were using plaintiff at the time of the release indicates that a substantial number of licensees preferred to have plaintiff handle its financing.

While the three finance companies approved by AMI were not a part of AMI, there was such a mutuality of ownership as to make this case analogous to the line of cases concerning tying arrangements involving the products or services of the same company or a subsidiary thereof. In many respects, this case is

5. This consent decree appears in Appendix Number 2–A and the letter sent out by AMI to its licensees in regard thereto appears in Appendix Number 2–B.

similar to United States v. General Motors Corp., 121 F.2d 376 (7th Cir. 1941), where General Motors attempted to tie to the sale of its motor vehicles the financing thereof to the purchaser through General Motors Acceptance Corporation, a wholly-owned subsidiary engaged in the business of automobile financing. The court there held that the General Motors arrangement was in violation of the Sherman Act and the evidence there, as here, shows that the course of conduct was not intended to discriminate against an inferior or unreliable finance service, but rather its entire force and effect was directed against any use of an independent finance company.

It is argued that ECB and TPI did not know of AMI's intention to create a monopoly. We do not see how ECB and TPI can legitimately claim total ignorance of the letter sent out by Teichman, which is the basis of this litigation, when Teichman was a member of the board of directors of each company. Even if the finance companies had no knowledge of a combination or conspiracy, they collaborated with AMI, participated in the combination, were beneficiaries thereof, and, therefore, must share responsibility for the resulting damage. Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 212 (9th Cir. 1964).

■ The Supreme Court has long held that it is not necessary to find a specific intent to restrain trade or to constitute a monopoly in order to find antitrust law violations. United States v. Griffith, 334 U.S. 100 at 105, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). A more recent decision appropriate for mention here is United States v. General Motors Corp., 384 U.S. 127, 142–143, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966), where the Court, speaking through Mr. Justice Fortas, said:

"* * * it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy —certainly not where, as here, joint and collaborative action was pervasive

in the initiation, execution, and fulfillment of the plan. (Citing cases.)"

Defendants also contend that the leniency with which they enforced the directive is evidence that there was no violation of the Sherman Act and they cite one or two instances where they gave licensees permission to use other finance companies. Such argument was rejected in Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

■ Defendants contend further that there was no evidence of public injury and, therefore, the court erred in concluding that defendants' conduct violated the Sherman Act. A private treble damage complaint asserting a *per se* violation of the Sherman Act need not allege or offer proof of public injury. Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). It is our opinion that the allegations in the instant case constitute a *per se* violation of the Act. See Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879, 883–884 (1st Cir. 1960).

There is dictum in the Supreme Court's opinion in In re McConnell, 370 U.S. 230, 231, 82 S.Ct. 1288, 1290, 8 L.Ed.2d 434 (1962), as follows:

"* * * we have held that the right of recovery of a plaintiff in a treble damage antitrust case does not depend at all on proving an economic injury to the public."

See also Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

We hold that there was no necessity in the instant case to prove public injury but that as was said in United States v. General Motors Corp., *supra,* 121 F.2d 376 at 401: "The best security to the public lies in the immediate removal of the finance restrictions."

■ Subsidiary arguments advanced by defendants include the assertion that the trial court made no findings of the

key elements of a § 2 offense such as relevant market power and intent. As to the market involved, Mr. Justice Jackson said in International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947): " * * * but also it is unreasonable, *per se,* to foreclose competitiors from any substantial market." To the same effect, see United States v. Griffith, *supra,* 334 U.S. at 107, 68 S.Ct. 941.

We have carefully considered all of the other attacks defendants have made upon the judgment entered by the trial court and find them to be without merit. Defendants contend that there is a deficiency in the evidence and in the findings of the district court to support its conclusions. We do not agree, as in our view there is a proper evidentiary basis for the court's findings, and the findings in their totality are sufficiently comprehensive for the ultimate conclusions. See Darter v. Greenville Community Hotel Corp., 301 F.2d 70 (4th Cir. 1962); Carr v. Yokohama Specie Bank, Ltd., 200 F.2d 251, 255 (9th Cir. 1952).

*Damages.*

■ The most vexatious problem for the trial court was the computation of damages once liability had been found. The trial court anticipated this from the inception of the case and constantly exhorted plaintiff to adduce evidence in direct support of a consistent theory of damages. This was to no avail, the plaintiff huing to the broad generality that it was entitled to an amount due for "loss caused by defendants' illegal conduct, not only of future profits reasonably to be expected and reasonably estimated, but also capital investments." We assume that plaintiff, in using the expression "capital investments," referred to loss of the $2,500.00 in AMI coupon books, which will be more fully discussed later. Thus, the trial proceeded with a multitude of exhibits, some hurriedly prepared on the night before their introduction and later withdrawn, depositions, and live testimony, all of which constitute several volumes of record evidence. It was in this setting that the trial court referred the case to a master with the hopeful notion that a certified public accountant would be able to pinpoint with certainty the exact damages to which plaintiff was entitled. This court's ruling, however, confined the master to record evidence as the case was already under submission. The master reported to the court that he was unable to calculate a reasonably accurate profit earned on the Arthur Murray business. This, of course, he could not do because of the method utilized by plaintiff in its bookkeeping which did not segregate its expenses involving the Arthur Murray accounts from the expenses of the other individual accounts handled by plaintiff. It would have been expecting too much to arrive at a precise figure of damages based on the audit reports, etc. which in turn failed to segregate the expenses relating to the individual accounts. It is sometimes extremely difficult for an attorney and an accountant to achieve rapport, even as it is with an attorney and a civil engineer who will not give a definitive answer on most problems without resort to his slide rule. This is not to say, however, that reasonable damages based on record evidence are not to be awarded merely because they are incapable of mathematical certainties. For example, in a personal injury action, there is no possible way to compute to a mathematical certainty an amount of damages —fair, reasonable, and supported by the evidence—on such elements of recovery as conscious pain and suffering.

In Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652, 660–661 (8th Cir. 1968), this court said:

"It is settled law that once the fact of damage has been established courts are allowed considerable leeway in arriving at the amount of damages. This principle was firmly recognized in Eastman Kodak Company of New York v. Southern Photo Materials Company, 273 U.S. 359, 47 S.Ct. 400,

71 L.Ed. 684 (1927), where the Supreme Court stated:

" ' "Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." * * * Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.' 273 U.S. at 379, 47 S.Ct. at 405."

At first blush, it would appear to any court that the award of damages in this case when equated with the income tax returns is inordinate, but we learn from other evidence which is without dispute that the Arthur Murray business was plaintiff's most profitable business; that plaintiff's bookkeeping method did not take into account payments on the installment notes until the notes were paid in full; and that plaintiff actually lost money on dentist accounts and others, all of which combined to make the income tax exhibits meaningless insofar as computing damages in this case is concerned.[6]

Cued by our opinion, the trial court adopted the approach approved by the Supreme Court in Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and from all of the record evidence arrived at an amount which it concluded was fair and just. The Court said in *Eastman, supra:*

" 'The plaintiff had an established business, and the future profits could be shown by past experience. It was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business.' " 273 U.S. at 379, 47 S.Ct. at 405.

In our view, there is ample evidence to support the court's finding that the annual discount income attributable to Arthur Murray's accounts was approximately $120,000.00. This figure is slightly smaller than that of the master but, as stated in its opinion, the district court did not use the master's report in arriving at its figures but made its own computations from the various audit reports and all of the evidence in the case.[7]

We note, however, that the master appeared to have no difficulty in ascertaining to his satisfaction the approximate amount of the discount income attributable to Arthur Murray's accounts. The court primarily based its findings on defendants' Exhibit 106 which in turn was based on audit reports introduced by plaintiff. According to defendants' own exhibits, plaintiff's total discount income for the fiscal year ending July 31, 1955 was $230,617.90, and for the fiscal year ending July 31, 1956 was $253,804.43. There was evidence to the effect that about one-half of the accounts handled by plaintiff during this period were Arthur Murray accounts and if the discount income attributable to Arthur Murray is figured on a 50% basis, it would amount to $115,308.96 for the 1955 fiscal year and $126,902.21 for the 1956 fiscal year.

There is very little, if any, disagreement between the conclusion reached by defendants in preparing Exhibit 106 from the plaintiff's records and between the conclusions reached by Judge Oliver. In any event, a consideration of all the evidence leads us to the conclusion that Judge Oliver's finding that plaintiff's discount income from Arthur Murray accounts during the year preceding the issuance of the directive was approxi-

6. Also, plaintiff's books were kept on an accrual basis and the income for tax purposes was reported on a cash basis.

7. The special master's calculation of the discount income attributable to Arthur Murray accounts for the fiscal year ending July 31, 1955 was $124,764.29 and for the year ending July 31, 1956 it was $120,303.30.

mately $120,000.00 is amply supported by the evidence.

■ This $120,000.00 figure, however, was obtained from exhibits, all of which were based on an accounting procedure described as a "deferred discount method," whereby the installments collected by plaintiff on AMI contracts were not entered on plaintiff's books at the time of collection but entry thereof was deferred until all installments had been paid, at which time the total of the installments on each particular contract involved was entered on the books as "discount income." Therefore, despite plaintiff's loss of new AMI business commencing with the Arthur Murray release, it continued to collect installments on many of the contracts then in force with Arthur Murray students and to enter the discount income on its books when the installment contracts were fully paid, thereby showing a substantial income from AMI accounts during each of the years of the damage period. For example, plaintiff's Exhibit 67, which is a report to plaintiff by its accounting firm, Peat, Marwick, Mitchell & Co., reflects that the amount of discount income received by plaintiff on its Arthur Murray installment contracts for the fiscal year ending July 31, 1957 was $57,241.36. Thus, it would appear that since the $120,000.00 figure was obtained from audit reports based on the same deferred accounting method or procedure, the amount of deferred income entered on the books during the three-year, ten-month period for which damages were awarded probably should be deducted from the $120,000.00 estimate of gross annual income in order to arrive at a figure which would more realistically reflect the actual loss. If the district court should so find, then, of course, the annual expenses for handling the additional business would necessarily be reduced proportionately. It could well be that, in studying the district court's opinion and the multitude of exhibits, we may have misinterpreted the

court's theory of damages and its method of computing them in its effort to arrive at a just verdict, and we point up this particular matter only with instructions to the district court that it consider the same in its recomputation of damages to be awarded.

■ Having determined that the gross annual income from the Arthur Murray business for the year immediately prior to April 1, 1956 was approximately $120,000.00, Judge Oliver then set out to determine how much additional in operating expenses it would cost plaintiff to handle that increase in business, by considering the ratio of expenses to income in prior years. Upon examination of the records, Judge Oliver found that the increase in the discount income received by plaintiff from all accounts between the years 1951–1952 and 1954–1955 was $106,132.94, and he used the increase in total expenses during this period as a yardstick in estimating the cost to plaintiff of handling $120,000.00 annual income from Arthur Murray accounts in addition to its non-Arthur Murray accounts, which comprised about one-half of its business in 1956. The records revealed that during this period, when the discount income increased approximately $106,000.00, the operating expenses increased approximately $58,000.00.

Plaintiff contended, however, that it would cost only $22,800.00 in additional expenses per year to handle the Arthur Murray accounts along with the rest of plaintiff's business. As Judge Oliver pointed out in his opinion, the estimate of $22,800.00 annual expenses is far too low a figure for handling $120,000.00 annual income, or even $106,000.00 income.

We have prepared a table from the figures set out in Judge Oliver's opinion showing how he made his calculations and this table appears as an appendix to this opinion.[8] Most of his figures were taken from defendants' Exhibit 106, which Arthur Murray or its counsel pre-

8. The table appears in Appendix Number 3.

pared from the auditor's reports for the benefit of the court, showing a comparative statement of income and summary of note purchases by plaintiff from 1947 through 1963, and from plaintiff's Exhibit 58, which was the estimate prepared by plaintiff of the additional operating costs it would have to expend annually in order to handle the Arthur Murray accounts.

In making its computation of expenses, the district court made no allocation to expense for any part of Mr. C. C. Hart's executive salary. Mr. Hart and his wife owned all the stock in plaintiff corporation and Mr. Hart managed the business.[9] It is uncontradicted by the evidence in this case that this type business was a particularly high risk business and it is obvious from the evidence that it takes great expertise for a profitable operation. The lack of success of some of the licensees who engaged in their own financing operations attests to this. Mr. Hart had spent all his adult life in the finance business and was responsible for the success of the plaintiff company. When he incorporated the plaintiff company in 1946, all nine of its accounts were AMI studio accounts. This business was not profitable in the beginning but at the time of the release it was the most profitable part of plaintiff's business. By that time, plaintiff enjoyed the business of between 45 and 48 AMI studios, despite the fact that ECB-KC and ECB-NY had been in business since 1948. Additionally, Gregory, who was trained in the business by plaintiff, was the manager of ECB of Kansas City, and AMI thought enough

of Redhair, who was then employed by plaintiff, to employ him away from plaintiff and install him as manager of TPI. Businesses such as this do not succeed except under the guidance and administration of someone knowledgeable in the field, and for these reasons we think a substantial part of Mr. Hart's salary, as, for example, perhaps in proportion to the ratio that AMI's business bears to plaintiff's total business, is properly chargeable as an expense item in computing plaintiff's net income from AMI business. In no sense, however, do we mean to imply by reference to an example that said proportion serve as a rigid guideline to be followed by the district court. The amount thereof is solely a matter for the court's discretion, and we are fully cognizant that the learned trial judge here, having lived with this case for years as he did, is necessarily in a much better position than this court to make a fair judgment on this item.

Defendants contend that the damage to plaintiff's business was not caused by the AMI release restricting the finance business to three companies as it was inevitable that it would have lost all of this business in any event by reason of the AMI-sponsored finance companies offering stock in their business to the licensees. We will not speculate on what might have occurred, but it is singular to note that despite the operations of ECB-KC and ECB-NY plaintiff was able to maintain a substantial volume of AMI studio business until the release of March 28, 1956. Furthermore, we are not concerned with what might possibly have occurred but what

---

9. Judge Oliver said:

"It should be noted that this calculation does not take into account the fact that the pattern generally reflected by plaintiff's full business experience in regard to the amount of executive salary paid plaintiff's president was that, generally speaking, he drew a salary in excess of the $25,000 when the volume of annual discount income was greater than it was in the 1951–1952 period (the year 1953 was an exception; plaintiff's president elected to draw no salary in that year). Such was cer-

tainly true in fiscal year 1954 in which plaintiff's president was paid $40,-402.58. We do not agree with the suggestion in some of the briefs, as distinguished from any evidence adduced by defendants, that a portion of plaintiff's president's executive salary should properly be allocated to the expense of handling the additional discount income. We find that plaintiff properly omitted that item from those listed in PX 58." Reserve Plan, Inc. v. Arthur Murray, Inc. 262 F.Supp. 565, 569 (W.D.Mo. 1967).

did occur and the defendants did not opt to choose the suggested route, but rather adopted a course which we find to be violative of the antitrust laws and damaging to plaintiff's business.

■ The trial court held that the amount of damages should be calculated to February 9, 1960, the day suit was filed. Defendants, on the other hand, contend that the cut-off date should have been either November 21, 1958, the date the consent decree was entered, or January 31, 1959, the date when the defendant companies terminated all contracts with Arthur Murray licensees in accordance with the requirements of the consent decree. In Volasco Products Co. v. Lloyd A. Fry Roofing Co., 346 F.2d 661 (6th Cir. 1965), damages were allowed which accrued even after the filing date of the suit. In that case it was said that the rule is that the plaintiff should be entitled to recover damages that accrue after the filing date, provided they are proximately caused by the wrongful and illegal acts committed by the defendant before the complaint was filed, and provided that they are proved with reasonable certainty and are not merely speculative or remote. See also A. C. Becken Co. v. Gemex Corp., 314 F.2d 839, 840–843 (7th Cir. 1963), cert. denied, 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963). We think the trial court was warranted in holding that damages should be recovered to the date suit was filed, since the evidence does not show that a substantial number of AMI studios had returned their business to plaintiff at that time.

■ We next come to the question of whether the entire Arthur Murray business was lost to plaintiff, and, if so, whether it was entirely attributable to the March 28 release or to other factors as well.

Judge Oliver found in his original opinion reported as Reserve Plan, Inc. v. Arthur Murray, Inc., *supra*, 38 F.R.D. 23 (1965), that all of the contracts which plaintiff had with Arthur Murray studios were terminated in April, 1956, except two. In the light of this finding by the trial court, there is certainly an evidentiary basis to justify a conclusion that the loss of this business was attributable to the March 28 release.

■ ■ Defendants also contend that the trial court committed clear error in finding that plaintiff was damaged in the amount of $2,500.00 for coupon books which plaintiff threw away in 1959. This finding was based on the testimony of Mr. C. C. Hart, President of plaintiff, who stated that he had thrown away blank Arthur Murray studio coupon books amounting to approximately 250 boxes of 100 each, which, at ten cents each, would have cost $2,500.00. He did not count them but merely estimated the number. Defendants contend that since these books were in blank they could have been used for any Arthur Murray school with which plaintiff might do business in the future, and, further that Mr. Hart's testimony is suspect because he failed to count the books although, at the time, he was preparing the antitrust action for damages.

There was no contradictory testimony on this question, however, and the court, on the basis of Mr. Hart's testimony, awarded the amount of his estimate in damages. The trial court is the judge of the credibility of the witnesses, and the holding on this point will be affirmed.

From what has been said above, it is our holding that a portion of the executive salary paid to Mr. Hart for his managerial services for plaintiff be allocated as operational expenses and added to the $60,000.00 expense figure which the district court calculated, said combined amount to be subtracted from the annual discount income attributable to the AMI business in arriving at the proper amount of net profits which plaintiff received from said business during the fiscal year ending April 1, 1956.

We direct the district court to reexamine the record evidence, including the exhibits, in order to ascertain wheth-

er an adjustment should be made in the amount of income from AMI accounts which plaintiff actually lost, in view of the evidence concerning deferred discount income received by plaintiff from AMI accounts during the period of time for which plaintiff was awarded damages, i. e., from March 28, 1956 to February 9, 1960, and further direct the court to make the adjustments necessary, if any, in its recomputation of damages.

We vacate the judgment and direct the trial court, upon a recomputation of the damage figure in accordance with this opinion, to enter a new judgment which shall bear interest from the date of its entry. It is also directed that the $40,000.00 judgment for attorneys' fee in the trial court be reduced proportionately as per the parties' agreement.

The plaintiff's petition for the award of additional attorneys' fee for this appeal is denied, and, because this opinion affirms on the liability issue, the costs of this appeal shall be taxed one-half against plaintiff and one-half against defendants.

It is so ordered.

## APPENDIX

### Number 1

The release sent by AMI to its licensees on March 28, 1956 reads as follows:

"After a number of years of experience in auditing bank plan records of our Licensees, we have come to the conclusion that the only way we can properly audit such records without substantially increasing the audit department in our office and without going into extensive field audits of both Licensees' records and finance company or bank records, is to have bank plans handled by finance companies whose records are uniform with ours and are kept in accordance with our suggestions and requirements.

"Up to now, we have accepted information supplied to us in various forms by various banks and finance companies, including companies operated by our Licensees. However, we have found many of these reports to be incomplete and we have found some of them to be inaccurate, thereby creating a considerable amount of unnecessary correspondence and re-auditing.

"Your franchise agreement provides that all installment contracts will be handled by banks or financial institutions approved by us.

"We have, therefore, decided that after April 30, 1956, we will approve only Educational Credit Bureau of New York, Educational Credit Bureau of Kansas City and Tuition Plan, Inc., a new company now being formed to handle business solely for Arthur Murray studios.

"Licensees may place their bank plan business with any one of these companies which are all fully qualified to service Licensees' bank plan contracts. Accordingly, after the new company is in operation, we will not permit any of the Licensees to engage in finance company operations.

"March 28, 1956.

Arthur Murray, Inc."

## APPENDIX

### Number 2-A

The Final Judgment, or "Consent Decree," in United States v. Arthur Murray, Inc., et al, Civil Action No. 12146 in the United States District Court for the Western District of Missouri, Kansas City Division, reads as follows:

"The plaintiff, United States of America, having filed its complaint herein on November 21, 1958, the defendants having appeared and filed their answers to the complaint denying the substantive allegations thereof, and the parties hereto, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without said Final Judgment constituting evidence or an admission by any party hereto in respect of any such issues:

"NOW, THEREFORE, before the taking of any testimony and without trial or adjudication of any issue of

fact or law herein or admission by any party hereto in respect of any such issue and upon consent of the parties hereto, it is hereby

"ORDERED, ADJUDGED AND DECREED as follows:

## "I

"This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states a claim for relief against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' commonly known as the Sherman Act, as amended.

## "II

"As used in this Final Judgment:

"(A) 'AMI' shall mean defendant Arthur Murray, Inc.;

"(B) 'ECB (KC)' shall mean defendant Educational Credit Bureau, Inc. (Kansas City);

"(C) 'ECB (NY)' shall mean defendant Educational Credit Bureau (N. Y.) Corp.;

"(D) 'TPI' shall mean defendant Tuition Plan, Inc.;

"(E) 'Consenting individual' shall mean any individual who submits to the jurisdiction of this Court and executes his or her consent to be bound and obligated by the terms of this Final Judgment as required by Section III of this Final Judgment;

"(F) 'Licensee' shall mean any person authorized by AMI to use the name and instructional methods of AMI in the operation of a dancing school in the United States, its territories or possessions or Canada;

"(G) 'Financial institution' shall mean any bank, finance company or other person, other than a family financial institution, engaged, or proposing to engage, in the business of accepting financing;

"(H) 'Family financial institution' shall mean a financial institution which is engaged in, or proposes to engage in, the business of accepting financing solely from a dancing school or schools owned, or a majority of whose stock is owned, by (i) AMI or (ii) a consenting individual or individuals;

"(I) 'Financing' or 'to finance' shall mean the sale, assignment or other transfer including transfer for collection only, to a financial institution of installment contracts, notes or other evidences of indebtedness given to evidence or secure indebtedness owing by pupils of a dancing school;

"(J) 'Person' shall mean any individual, partnership, firm, corporation, association or other business or legal entity.

## "III

"(A) It appearing to this Court, pursuant to Section 5 of the Sherman Act, that the ends of justice require that certain individuals connected with, or having an interest in, defendant AMI, be brought before this Court, the said individuals (as consenting individuals) hereby appear as additional parties waiving the necessity of being summoned and agreeing to be bound by the applicable provisions of this Final Judgment;

"(B) The provisions of this Final Judgment shall be applicable to any consenting individual or defendant and shall apply to its subsidiaries, successors, assigns, officers, directors, employees and agents, and to all other persons in active concert or participation with any such consenting individual or defendant who receive actual notice of this Final Judgment by personal service or otherwise.

## "IV

"(A) Defendant AMI is enjoined and restrained from having any officer, director, agent or employee who is at the same time an officer, director, agent or employee of any financial institution, provided however, that David A. Teichman may, for a period not exceeding one (1) year from the date of entry of this Final Judgment, remain as an officer and director of ECB (NY);

"(B) Defendant AMI is enjoined and restrained from permitting any officers, directors, agents or employees to continue to serve as such officer, director, agent or employee of AMI if such individual (excepting Ira Murray and David A. Teichman for a period of one (1) year from the date of entry of this Final Judgment), directly or indirectly, owns or controls any stock or other security issued by, or has any financial interest in, any of the defendants ECB (KC), ECB (NY) or TPI;

"(C) Each consenting individual is ordered and directed to sell or otherwise dispose of, within one year from date of entry of this Final Judgment, all right, title and interest, owned or controlled by them, directly or indirectly, in any stock or other security issued by, or other financial interest in, any of the defendants ECB (KC), ECB (NY) or TPI; provided, however, no consenting individual disposing of such stock pursuant to Sections IV (B) and (C) of this Final Judgment shall be deemed to have acted in violation thereof by retaining, accepting or enforcing a bona fide non-voting lien, pledge or other form of security for not longer than thirty-six (36) months on such stock for the sole purpose of securing to such defendant the full purchase price of such stock;

"(D) Defendant AMI and each of the consenting individuals are enjoined and restrained from acquiring, directly or indirectly, any right, title or interest in any stock or other security issued by, or any other financial interest in, ECB (KC), ECB (NY), TPI or any other financial institution which accepts financing business from any licensee;

"(E) Each of the consenting individuals is enjoined and restrained from serving as an officer, agent, employee or director of any financial institution accepting financing business from any licensee;

"(F) Defendant AMI and each of the consenting individuals is enjoined and restrained from:

"(1) Continuing for longer than one (1) month from the date of entry of this Final Judgment any outstanding loan heretofore made by any of them to defendant ECB (NY) or defendant ECB (KC);

"(2) Continuing for longer than three (3) years (or such longer time, not beyond five (5) years, as the Court may direct) from the date of entry of this Final Judgment any outstanding loan heretofore made by any of them to defendant TPI. During such period of time as herein provided for, defendant TPI is ordered and directed to apply at least one-half of its net earnings after taxes each year as reported by defendant TPI in its annual statement to its stockholders to liquidation of any such outstanding loan;

"(3) Making any additional or future loans to organize or support any financial institution accepting or proposing to accept financing business from any licensee.

"V

"(A) Each of the defendnts ECB (NY), ECB (KC) and TPI is enjoined and restrained from accepting financing from any licensee if any person owning, directly or indirectly, any interest in any such defendant, also holds or exercises, directly or indirectly, any right to vote any of the stock of AMI;

"(B) Defendant AMI is enjoined and restrained from permitting any of its stock to be voted by any person who owns any of the stock of, or other financial interest in, any financial institution (other than a family financial institution) which accepts financing from any licensee;

"(C) Defendant AMI is enjoined and restrained from requiring or requesting any licensee to agree that any financial institution shall report to defendant AMI any information as to contracts placed or collections made by the financial institution;

"(D) Each of the defendants and consenting individuals is enjoined and restrained from limiting or restricting, or attempting to limit or restrict, in any manner, the financial institution used or

to be used by any applicant for a license or any licensee;

"(E) Defendant AMI is enjoined and restrained from:

"(1) Revoking or threatening to revoke the license of any licensee because such licensee declines to agree to place or does not place any or all of its financing business with any particular financial institution;

"(2) Requiring, directly or indirectly, any person, as a condition to the granting, continuing or renewing of a license, to agree to finance through any financial institution named, designated or approved by defendant AMI;

"(3) Refusing to grant or renew a license, or discriminating in the terms or conditions of any license, because the applicant or licensee will not, or does not, finance through a financial institution named, designated or approved by the defendant AMI;

"(4) Enforcing or claiming any right under any contract, agreement or understanding which prevents any licensee from financing through any financial institution other than the financial institution named, designated or approved by defendant AMI;

"(F) Provided that nothing in this Final Judgment shall prohibit, after notice in writing to the plaintiff, the disapproval by defendant AMI of the use by a licensee of a financial institution on the sole ground that such financial institution engages in oppressive or deceptive practices substantially injurious to the good will and reputation of defendant AMI; but, in such an event, the burden of proof in any proceeding with respect thereto shall be upon defendant AMI.

"VI

Defendants ECB (NY), ECB (KC) and TPI are each ordered and directed to terminate within seventy-five (75) days after the date of entry of this Final Judgment all agreements with licensees doing business with such defendants, provided, however, that such defendants may renegotiate a new agreement with any licensee provided that:

"(1) Such agreement is not inconsistent with this Final Judgment;

"(2) The term of such agreement shall not be for more than one (1) year; and

"(3) Such agreement may be cancelled by either party at the end of any thirty (30) day period upon written notice to the other party.

"VII

"Defendant AMI is ordered and directed within fifteen (15) days after the date of entry of this Final Judgment, to notify each licensee of the entry of this Final Judgment and to furnish to each such licensee a true copy of this Final Judgment.

"VIII

"For the purpose of securing compliance with this Final Judgment, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant, made to its principal office, be permitted, subject to any legally recognized privilege:

"(A) Access, during the office hours of said defendant to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

"(B) Subject to the reasonable convenience of said defendant, and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding any such matters.

"Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may

from time to time be necessary to the enforcement of this Final Judgment.

"No information obtained by the means provided in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

"IX

"Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the termination, amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

"Dated: November 21, 1958.

"R. M. Duncan
United States District Judge

"We hereby consent to the making and entry of the foregoing Final Judgment.

For the Plaintiff:

Victor R. Hansen
   Victor R. Hansen
Assistant Attorney General

Charles F. B. McAleer

W. D. Kilgore, Jr.
Harry N. Burgess
   Attorneys, Department
   of Justice

Noel E. Story
J. Ronald Trost
   Attorneys, Department of
   Justice

For defendants Arthur Murray, Inc. and Educational Credit Bureau (N.Y.) Corp.

Edward L. Scheufler
   U. S. Atty."

Paul M. Coonrod
   Paul M. Coonrod
Cahill, Gordon, Reindel & Ohl
By Jerrold G. Van Cise
Detlev F. Vagts
   Detlev F. Vagts

For defendants Educational Credit Bureau, Inc. (Kansas City) and Tuition Plan, Inc.

Morrison, Hecker, Buck, Cozad & Rogers
By John A. Morrison.

———◆———

## APPENDIX

### Number 2–B

The letter sent by AMI to its licensees notifying them of the consent decree and revoking its March 28, 1956 release reads as follows:

"In March of 1956, we sent a release to our licensees advising them that their

bank plan contracts should be handled by banks or finance companies approved by us.

"In the same release we stated that Educational Credit Bureau of Kansas City, Education Credit Bureau of New York and Tuition Plan of Kansas City were the companies approved by us for the handling of bank plan contracts of our Licensees.

"With the growth of our licensing system over the past few years, it became increasingly difficult for us to keep track of collection methods used by numerous finance companies in every part of the United States. It was therefore thought both desirable and lawful that we should suggest that Licensees use only finance companies whose collection methods and general operational procedures were familiar to us.

"The primary purpose therefore, of the above mentioned release was to make sure that the companies which handled bank plan contracts did not use objectionable tactics in collecting payments due under pupils' contracts.

"However, the Government advised us a few months ago that it intended to institute an action against Educational Credit Bureau of Kansas City, Educa-

tional Credit Bureau of New York, Tuition Plan of Kansas City and us, under the Federal 'Anti-Trust' Laws. Rather than become involved in litigation with the Government, we voluntarily consented to the entry of a decree in the form enclosed, in the Federal Court.

"Our sole concern is to make sure that Arthur Murray pupils are not harassed by strong-arm collection methods and it is our understanding that the decree consented to by us gives the pupils this protection.

"Accordingly, any provision of any franchise, contract, agreement or understanding which prevents any of our Licensees from financing through any financial institution other than a financial institution named, designated or approved by us is hereby irrevocably waived, provided however, that in accordance with the procedures outlined in the enclosed decree, we reserve the right to disapprove of the use by a Licensee of any financial institution on the sole ground that it engages in oppressive or deceptive practices substantially injurious to our good will and reputation.

"Arthur Murray, Inc.

"Dec. 3, 1958."

## APPENDIX

### Number 3

The following table was prepared from Judge Oliver's opinion showing the figures on which he based his calculations in estimating plaintiff's annual net profit for the year preceding April 1, 1956:

| Item | 1951 | 1952 | Average for 1951 & 1952 | 1954 | 1955 | Average for 1954 & 1955 | Increase 1954-55 over 1951-52 | Plaintiff's Estimate of Annual Expenses for Handling Arthur Murray Income (PX 58)[1] | Underestimate by Plaintiff | Overestimate by Plaintiff |
|---|---|---|---|---|---|---|---|---|---|---|
| Discount Income Average | $110,642.85 | $120,810.85 | $115,726.85 | $213,101.67 | $230,617.92 | $221,859.79 | $106,132.94 | | | |
| *Expenses* | | | | | | | | | | |
| Salaries (other than executive) Average | $ 28,333.68 | $ 32,257.91 | $ 30,295.79 | $ 63,547.91 | $ 75,318.42 | $ 69,433.16 | $ 39,137.37 | $ 9,900.00 | $ 29,237.87 | |
| Postage | 4,985.40 | 8,849.42 | | 10,930.51 | 21,448.26 / 8,955.00 / 12,493.26 | (Not used) | | | | |
| Average | | | 6,917.41 | | | 11,736.88 | 4,819.47 | 5,000.00 | | $ 180.53 |
| Stationery Average | 12,819.55 | 10,429.59 | 11,624.57 | 13,573.90 | 17,221.79 | 15,397.84 | 3,773.27 | 4,000.00 | | 226.73 |
| Payroll Tax | | | | | | | 229.97 | 400.00 | | 170.03 |
| Additional Travel | | | | | | | 2,846.45 | 1,000.00 | 1,846.45 | |
| Miscellaneous | | | | | | | 2,096.92 | 1,000.00 | 1,096.92 | |
| Telephone | | | | | | | 3,069.91 | 300.00 | 2,769.91 | |
| Collection | | | | | | | 1,297.23 | 600.00 | 697.23 | |
| Entertainment | | | | | | | 520.86 | 300.00 | 220.86 | |
| Service and Maintenance | | | | | | | .00 | 300.00 | | 300.00 |
| Totals | | | | | | | $ 57,791.45[2] | $ 22,800.00 | $ 35,868.74 | $ 877.29 |

[1] Reserve Plan estimated that it would take only $22,800.00 in extra operational expenses per year to handle $90,000.00 to $100,000.00 additional income per month.

[2] This appears in Judge Oliver's opinion as $57,791.55, which is evidently a typographical error.